# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VIVINT SOLAR, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-0988-PAF |
| JIM LUNDBERG, | ) ) ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 31, 2024
Date Decided: May 30, 2024
Date Corrected: June 18, 2024

Michael C. Heyden, Jr., GORDON REES SCULLY MANSKUHANI, LLP, Wilmington, Delaware; Peggy A. Tomsic, Bryant L. Watson, MAGLEBY, CATAXINOS & GREENWOOD, Salt Lake City, Utah; *Attorneys for Plaintiff/Counterclaim Defendant Vivint Solar, Inc.*

Timothy R. Dudderar, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Alan C. Bradshaw, Chad R. Derum, Mitch M. Longson, MANNING CURTIS BRADSHAW & BEDNAR PLLC, Salt Lake City, Utah; *Attorneys for Defendant/Counterclaim Plaintiff Jim Lundberg.*

**FIORAVANTI, Vice Chancellor**

This case involves a dispute between a Delaware corporation and one of its former employees over equity incentive awards. Jim Lundberg is a former associate general counsel of Vivint Solar, Inc. ("Solar" or the "Company"). While employed at Solar, Lundberg received several equity incentive awards under an equity incentive plan. In the summer of 2016, Lundberg left Solar to join Vivint Smart Home, Inc. ("Smart Home"). Solar and Smart Home shared a common parent that owned more than 50% of the equity of both companies. When Lundberg left Solar for Smart Home in August 2016, Solar canceled Lundberg's unvested awards. Lundberg claims not to have known this until the summer of 2020, after he inquired about his awards following Solar's announcement that it was being acquired in a merger. The Company then informed Lundberg that all of his awards had been canceled. What followed was sprawling litigation in Utah and in this court.

The central issue in this case is whether Lundberg's awards continued to vest after he left Solar and went to work for Smart Home. Under the operative equity incentive plan, participation in the plan terminates on the last day that a participant "actively provides services for a member of the Company Group." Lundberg argues that Smart Home is within the definition of Company Group.

The operative equity incentive plan is administered by the Solar board of directors and its Compensation Committee, which are defined as the "Administrator." Solar argues that the Administrator has determined that once a

Solar employee's employment at *Solar* terminates, all of the employee's unvested awards are canceled and all vested stock option awards are canceled unless they are timely exercised. Solar maintains that under the express terms of the plan, the Administrator's determination is final and binding and this court must afford it deference.

In this post-trial opinion, the court finds that the plan Administrator never made a determination to interpret the plan as Solar claims it did. The court concludes that, under the plain language of the plan, Smart Home and Solar are both within the definition of Company Group and that Solar breached the plan by canceling Lundberg's vested and unvested awards after he seamlessly moved from Solar to Smart Home. Accordingly, Lundberg is entitled to damages, but only as to the portions of his counterclaims that are not otherwise time-barred.

The court also concludes that Lundberg breached the plan by initially filing claims in Utah in contravention of the exclusive forum provision in the plan, but that does not entitle Solar to monetary damages or a permanent injunction.

## I. BACKGROUND

These are the facts as the court finds them after trial.[1]

---

[1] Other factual findings are contained in the analysis of the claims. The trial record consists of deposition testimony from ten witnesses, some of whom were deposed more than once,

### A. The Parties

Solar is a Delaware corporation with its executive offices in Lehi, Utah.[2] The Company provides full-service residential solar energy systems in the United States.[3] On September 30, 2014, Solar registered its stock on the New York Stock Exchange under the symbol "VSLR" in an Initial Public Offering (the "IPO").[4] In October 2020, the Company was acquired by non-party Sunrun Inc. ("Sunrun").[5] Solar is now a wholly owned subsidiary of Sunrun.[6] Sunrun's stock is publicly traded on the Nasdaq Global Select Market.

Smart Home, a non-party, is a Delaware corporation with its executive offices in Utah.[7] At all relevant times, non-party 313 Acquisition LLC ("313 Acquisition")

---

and approximately 200 exhibits. Attentive readers will notice that exhibit numbers range into the 300s. This is explained by the parties' decision not to number the exhibits sequentially. The deposition testimony is cited as "Dep.," with dates for people who have multiple depositions; trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the relevant section, page, paragraph, exhibit, or docket number. Dkt. 1 is cited as "Compl." Dkt. 49 is cited as "Answer." Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text.

[2] PTO ¶ 24(a).

[3] Dkt. 154 ¶ 16 [hereinafter "Black Decl."].

[4] JX 20 at SOLAR001363–64; Black Decl. ¶ 23.

[5] Black Decl. ¶ 16.

[6] *Id.*

[7] Compl. ¶ 4; Answer ¶ 4.

3

owned more than 50% of the outstanding stock of both Solar and Smart Home.[8] 313 Acquisition was an investment vehicle controlled by The Blackstone Group.[9]

Lundberg, a Utah resident, began his employment as Solar's Associate General Counsel in May 2014.[10] In July 2016, Lundberg became employed by Smart Home, where he is currently employed.[11] On August 21, 2016, Lundberg's employment with Solar officially terminated.[12] As part of his agreement with Smart Home, Lundberg continued to oversee a few matters for which he was responsible at Solar and assisted with the transition of a few matters to his successor while he was employed at Smart Home.[13]

### B.    Solar's Equity Compensation Plans

Solar had two equity incentive plans before Sunrun acquired the Company in 2020. In July 2013, Solar adopted the 2013 Omnibus Incentive Plan (the "2013

---

[8] 313 Acquisition's ownership of at least 50% of the equity of Solar and Smart Home at all relevant times is not disputed. *See* Def.'s Post Tr. Br. 3 (presenting argument based on the fact that "50% or more of each entity's voting stock was owned by 313 Acquisition"); Pl.'s Post Tr. Br. 58 (conceding that "313 Acquisition owned more than 50% of both companies and elected the majority of directors to both boards").

[9] Wallace Dep. 8:13–16, 11:19–12:2.

[10] PTO ¶ 24(b).

[11] *Id.* ¶ 24(h).

[12] *Id.* ¶ 24(g).

[13] JX 1 at SOLAR000928; JX 44 at VSH000048; Black Decl. ¶¶ 52–54.

Plan").[14] Solar granted equity awards under the 2013 Plan until September 2014.[15] In connection with its IPO, Solar implemented a 2014 Equity Incentive Plan in September 2014 (the "2014 Plan").[16] Since then, Solar granted equity awards under the 2014 Plan.[17] All of the awards at issue in this case were granted under the 2014 Plan.[18] The 2014 Plan and all of the award agreements granted under the 2014 Plan are governed by Delaware law and designate Delaware courts as the exclusive forum for all legal claims under those agreements.[19]

The 2014 Plan provides that Stock Option and Restricted Stock Unit ("RSU") awards continue to vest until the "Termination of Status Date."[20] The Termination of Status Date occurs when the award recipient's status as a "Service Provider" ends.[21] The 2014 Plan defines a Service Provider as, among other things, an

---

[14] JX 20 at SOLAR001531; JX 332 at Lundberg000761.

[15] Black Decl. ¶ 18.

[16] *Id.* ¶ 23; JX 20 at SOLAR001528.

[17] Black Decl. ¶ 18.

[18] PTO ¶¶ 24(c)–(e).

[19] JX 2 § 3(h); JX 3 Ex. A ¶ 12(i); JX 4 Ex. A ¶ 13(i); JX 5 Ex. A ¶ 12(i).

[20] JX 2 § 3(c)(iii).

[21] *Id.* § 3(c)(i).

individual "employed by the Company or any member of the Company Group."[22]

"Company Group" is defined to include Solar, its subsidiaries, its parent, and "any entity that, from time to time and at the time of any determination, directly or indirectly, is in control of, is controlled by or is under common control with the Company."[23]

Administration of the 2014 Plan is delegated to Solar's "Board or a Committee of the Board constituted to satisfy Applicable Laws (the 'Administrator')."[24] The 2014 Plan provides that, "[s]ubject to the [2014] Plan, any limitations on delegations specified by the Board, and Applicable Laws, the Administrator will have the authority, in its sole discretion to make any determinations deemed necessary or advisable to administer the Plan."[25] It also declares that "[t]he Administrator's decisions, determinations and interpretations will be final and binding on all Participants and any other holders of Awards."[26] The Administrator's unilateral

---

[22] *Id.* § 21(kk) (defining "Service Provider" as "an Employee, Director or Consultant"); *id.* § 21(m) (defining "Employee" as "any person, including Officers and Directors, employed by the Company or any member of the Company Group. However, with respect to Incentive Stock Options, an Employee must be employed by the Company or any Parent or Subsidiary of the Company. Neither service as a Director nor payment of a director's fee by the Company will constitute 'employment' by the Company.").

[23] *Id.* § 21(j).

[24] *Id.* § 3(a)(i).

[25] *Id.* § 3(b).

[26] *Id.* § 3(i).

6

authority, however, is not absolute. For example, Section 18(c) provides that "no amendment, alteration, suspension or termination of the Plan or an Award under it will materially impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing and signed by the Participant and the Company."[27]

The 2014 Plan expressly permits the Administrator to delegate certain tasks and powers, such as "ministerial duties" and "the authority to grant Options, Stock Appreciation Rights, or other Awards."[28] Interpreting the 2014 Plan is not one of the delegable tasks.

## C. Administration of the 2014 Plan

On May 9, 2014, Solar's board of directors (the "Board") created the Compensation Committee.[29] Among the committee's duties was to "administer the Company's equity compensation plans."[30] Upon its creation, the Compensation Committee kept minutes, which describe its discussions about and resolutions with respect to the equity plans it administered.[31] The Board also approved resolutions

---

[27] *Id.* § 18(c).

[28] *Id.* § 3(a)(ii), 3(b)(xi).

[29] JX 142 at SOLAR219755.

[30] *Id.*

[31] *See, e.g.*, JX 25; JX 26; JX 28; JX 38.

relating to compensation.[32] Several of the Compensation Committee's resolutions delegated authority to Solar's officers to carry out each resolution's intent.[33] There is no document evidencing a delegation of authority to interpret the 2014 Plan to any person or entity other than the Compensation Committee.

On February 25, 2015, Solar entered into an agreement with Morgan Stanley Smith Barney LLC ("Morgan Stanley") to provide administrative services for the 2013 Plan and 2014 Plan.[34] In addition to tracking the awards internally, Morgan Stanley sent periodic statements to employees.[35] To assist in Morgan Stanley's timely administration of the awards, Solar used an automated program to allow its human resources management platform, Workday, to notify Morgan Stanley of an

---

[32] *See, e.g.*, JX 321; JX 344.

[33] Black Decl. ¶ 37; *see, e.g.*, JX 26 at SOLAR230240 ("RESOLVED FURTHER: That the Committee hereby authorizes and empowers the officers of the Corporation to take all action and to prepare, execute, deliver and file all agreements, documents and instruments that such officer deems necessary or advisable to carry out the intent of these resolutions and evidence the equity award grants hereby made, including without limitation the appropriate award agreement for each such grant and, at the time each such [sic] is exercised or vested, as the case may be, to issue the underlying vested shares of common stock in accordance with the terms of the 2014 Plan and respective award agreements, and to authorize payment of all expenses and fees of the Corporation arising in connection with the actions taken in accordance with the foregoing resolutions, and to carry out the intent and accomplish the purpose thereof and of these resolutions."); JX 28 at SOLAR230256 (same); JX 38 at SOLAR230268 (same).

[34] JX 143 at SOLAR192177.

[35] Black Dep. 47:1–7; *see, e.g.*, JX 7; JX 8; JX 9; JX 15.

8

employee's termination.[36]  Upon notification of an employee's termination, the Morgan Stanley system would automatically forfeit the unvested portion of the award.[37]  Solar believed that Morgan Stanley communicated the forfeiture of the equity awards to terminated employees, but neither party has produced a termination notice from Morgan Stanley for Lundberg or any other employee.[38]  In mid-2017, Solar switched from Morgan Stanley to Merrill Lynch as its third-party administrator.[39]  After the transition, employees with legacy Morgan Stanley accounts retained access to those accounts, and Solar could still access that information through its Merrill Lynch portal.[40]

### D.    Lundberg Joins Solar and Receives Several Equity Grants

On May 16, 2014, Solar hired Lundberg as its Associate General Counsel.[41] Within months of starting his employment, Lundberg received equity grants of

---

[36] Meads Dep. 83:12–20, 86:7–18, 92:16–21; Dkt. 153 Ex. B ¶¶ 4–10 [hereinafter "Meads Decl."].

[37] 02/14/2023 Lindquist Dep. 131:13–132:25; Black Dep. 43:22–44:22; Meads Dep. 83:12–20, 86:7–18, 92:16–21.

[38] Black Dep. 44:24–45:24; Meads Decl. ¶ 11; *see also* Black Dep. 46:13–19 ("Q:  Can you identify a form of email that was allegedly sent to individuals who had been terminated?  A: I cannot.  Q:  Have you ever seen such an email?  A: Yes.  I've seen those emails from brokerages.  I don't recall Morgan Stanley specifically.").

[39] Black Dep. 47:10–17; Black Decl. ¶ 28.

[40] Black Decl. ¶ 28.

[41] PTO ¶ 24(b).  Lundberg was originally employed by Vivint Solar Developer, LLC, which became Solar, as defined, later that year.  JX 116.

30,000 stock options under the 2013 Plan.[42]  Those grants are not at issue in this case.

In April 2015, Lundberg received a notification letter from Tessa White, Solar's Senior Vice President of Human Capital, indicating that Lundberg would be receiving another round of equity grants, this time under the 2014 Plan.[43]  The letter stated that Lundberg "must be employed by Vivint Solar on the effective date of grant to receive the awards and that the awards will be subject to a vesting schedule, and all vesting will be subject to your continued employment with Vivint Solar through applicable vesting dates."[44]  The letter also explained that Lundberg's awards would be subject to the terms and conditions applicable to the stock option awards or RSU awards granted under the 2014 Plan, as described in the 2014 Plan and their respective equity agreements.[45]  Other individuals received notification letters with identical language.[46]

---

[42] JX 103 at Lundberg000186; Dkt. 19 Ex. 1 ¶¶ 12, 48–49.

[43] JX 12.  White helped Lindquist carry out the Compensation Committee's resolutions. 09/16/2021 Lindquist Dep. 83:23–84:3.

[44] JX 12 at SOLAR001347.

[45] *Id.*

[46] *See, e.g.*, JX 59 at SOLAR233028; JX 316 at SOLAR215192.

On May 14, 2015, Solar granted Lundberg 7,632 unvested stock option awards pursuant to a "2015 Option Agreement"[47] and 7,632 unvested RSUs pursuant to a "2015 RSU Agreement" (together, the "2015 Grants").[48] The two agreements underlying the 2015 Grants stated that the defined terms in the 2014 Plan applied to the grants[49] and that "[i]f there is a conflict between the Plan and this Agreement, the Plan will prevail."[50]

In connection with these awards, Lundberg created a Morgan Stanley StockPlan Connect account and reviewed and accepted the 2014 Plan, the 2014 Plan Prospectus, and 2015 Option Agreement and 2015 RSU Agreement.[51] Thereafter, Lundberg received periodic statements from Morgan Stanley about his awards.[52]

### E. The Failed Merger with SunEdison and the 2016 Grant

In mid-2015, Solar and SunEdison, Inc. ("SunEdison") announced that they had signed a definitive merger agreement that provided for SunEdison's acquisition of Solar.[53] The merger was never consummated, and SunEdison filed for bankruptcy

---

[47] PTO ¶ 24(c); JX 4.

[48] PTO ¶ 24(d); JX 3.

[49] JX 3 at SOLAR000035; JX 4 at SOLAR000043.

[50] JX 3 Ex. A ¶ 1; JX 4 Ex. A ¶ 1.

[51] 07/27/2021 Lundberg Dep. 138:19–139:5, 142:3–16.

[52] *See, e.g.*, JX 7; JX 8; JX 9; JX 15.

[53] Black Decl. ¶ 58; 3/9/2023 Lundberg Dep. 41:8–15; 2/14/2023 Lindquist Dep. 105:12–14; Meads Dep. 17:18–24; JX 44 at VSH000048.

in April 2016.[54]  The resulting uncertainty of Solar's future led key employees to look for other opportunities.[55]

To minimize the exodus of employees, David Bywater, Solar's new interim CEO, presented the Compensation Committee with a proposed employee retention plan.[56]  The new retention plan aimed to incentivize key employees to stay at Solar by granting them substantial RSUs that would vest over two years.[57]  The Compensation Committee approved the new retention plan on May 9, 2016.[58]  The Compensation Committee's authorizing resolution stated that the RSU awards were "subject to the Participant continuing to be a Service Provider (as defined in the 2014 Plan) through each applicable vesting dates [sic]."[59]  Lundberg was among the recipients of RSU awards under the new retention plan.[60]

On May 11, 2016, Solar notified Lundberg that he was granted an additional 88,706 unvested RSUs under the 2014 Plan pursuant to the "2016 RSU Agreement"

---

[54] Black Decl. ¶ 58.

[55] *Id.* ¶ 59.

[56] JX 38; Bywater Dep. 159:10–24.

[57] *See* Bywater Dep. 158:7–16 ("[T]he order of magnitude of the outflow of talent, and the existential threat that it created, was obviously very heavy upon my consciousness."); JX 38.

[58] JX 38 at SOLAR230267–68.

[59] *Id.* at SOLAR230268.

[60] *Id.* at SOLAR230271.

(the "2016 Grant" and together with the 2015 Grants, the "Awards").[61]  The grant date for the 2016 Grant is May 9, 2016.[62]  Like the notification letter for the 2015 Grants, the notification letter for the 2016 Grant stated that "all vesting will be subject to your continued employment with Vivint Solar through applicable vesting dates."[63]  The letter also stated that Lundberg's awards were subject to the terms and conditions applicable to RSU awards granted under the 2014 Plan, as described in the 2014 Plan and the award agreement.[64]  The 2016 RSU Agreement, like the agreements for the 2015 Grants, stated that it incorporated defined terms from the 2014 Plan and that the 2014 Plan controlled in the event of any conflict.[65]

## F.     Vesting Schedule and Delivery

A quarter of the awards under the 2015 Grants were to vest after one year, and 1/16th of the awards would vest on each of the next twelve quarterly anniversary dates.[66]  The 2016 Grant had an accelerated vesting schedule:  half of the 2016 Grant

---

[61] JX 22.

[62] *Id.*; PTO ¶ 24(e).

[63] JX 22.

[64] *Id.*

[65] JX 5 at SOLAR000054; *id.* Ex. A ¶ 1.

[66] JX 3 at SOLAR000035; JX 4 at SOLAR000043.

vested one year from the grant date and the remaining half vested two years from the grant date.[67]

According to the 2014 Plan, "Payment of earned Restricted Stock Units will be made when practicable after the date set forth in the Award Agreement and determined by the Administrator."[68] The award agreements for the RSU portion of the 2015 Grants and for the 2016 Grant both provided that "vested Restricted Stock Units will be paid in whole Shares as soon as practicable after vesting, but in each such case within the period 60 days following the vesting date."[69] The stock option portion of the 2015 Grants became exercisable on the date of vesting.[70]

The Awards' vesting schedules require the participant to "continu[e] to be a Service Provider through each such date" for vesting to continue.[71] If Lundberg ceased to be a Service Provider, the unvested portion of each of the Awards would immediately terminate, and any vested stock options would terminate if not exercised within three months after the termination of his Service Provider status.[72]

---

[67] JX 22 (specifying that the tranches would vest on May 15, 2017, and May 15, 2018).

[68] JX 2 § 6(d).

[69] JX 3 Ex. A ¶ 2; JX 5 Ex. A ¶ 2.

[70] JX 4 Ex. A ¶ 2.

[71] JX 3 at SOLAR000035; JX 4 at SOLAR000043; JX 5 at SOLAR000054.

[72] JX 3 at SOLAR000035; JX 4 at SOLAR000043; JX 5 at SOLAR000054.

All of the award agreements state that "[t]he date of Participant's termination as a Service Provider is detailed in Section 3(c) of the Plan."[73]

## G. Lundberg Moves from Solar to Smart Home

In the wake of the failed SunEdison merger, Lundberg decided to leave Solar.[74] At that time, Lundberg had multiple ongoing projects at Solar. Among them were the securities litigation related to Solar's IPO and the ongoing SunEdison bankruptcy.[75]

In April 2016, Lundberg confided in Shawn Lindquist, Solar's Chief Legal Counsel, that he was considering leaving Solar to rejoin his prior law firm.[76]

---

[73] JX 3 Ex. A ¶ 5; JX 4 Ex. A ¶ 4; JX 5 Ex. A ¶ 5.

[74] JX 335 at SOLAR196454.

[75] Smart Home 30(b)(6) Dep. 16:2–11. Lundberg's offer letter from Smart Home identified both projects and conditioned his employment at Smart Home on his continued work for Solar on each "for no additional compensation or consideration" while employed at Smart Home. JX 44 at VSH000048 (describing Lundberg's ongoing major projects at Solar as of May 27, 2016, as relating to "the SunEdison, Inc. unsecured creditors' committee and the liquidation of VSLR's claim in the SunEdison bankruptcy, including the pending litigation involving Solar that is related to that certain Agreement and Plan of Merger between SunEdison and Solar dated as of July 20, 2015, as amended on December 9, 2015, and (2) the securities class action lawsuits related to Solar's initial public offering of common stock currently pending in the U.S. District Court for the Southern District of New York against Solar and certain of its officers and directors"); Pl's Answering Tr. Br. 36–37 ("Lundberg also admits that it was 'Lundberg's Vivint Smart Home offer [that] was expressly conditioned on Lundberg's agreement to continue to provide 'consulting services' to Vivint Solar on certain outstanding legal matters, including the SunEdison bankruptcy, 'for no additional compensation.'" (alteration in original) (quoting Def.'s Opening Tr. Br. 22)).

[76] JX 335 at SOLAR196454; 02/14/2023 Lindquist Dep. 101:22–102:17.

Lundberg at that time was unaware that Lindquist was about to leave Solar to join Smart Home. In an email memorandum, Lindquist urged Bywater to persuade Lundberg to remain in the fold.[77] Lindquist wrote, in pertinent part:

> We need to keep [Lundberg] in the Vivint family - he is way too valuable. I'll want to be able to speak with him about it this weekend and do all that I can to persuade him to come over to [Smart Home]. If he's interested, I'd map out a [sic] 8-12 week transition plan that would be ideal for both companies and enable him to continue to sit on the Creditors' Committee of the [SunEdison] bankruptcy even after he comes over to [Smart Home].[78]

Thereafter, Lundberg discussed with Bywater, Lindquist, and Dan Black (Lindquist's eventual successor) the possibility of Lundberg's moving to Smart Home with an active concurrent period in which he would continue running his Solar matters while he transitioned them to his successor.[79] Ultimately, Bywater convinced Lundberg to move to Smart Home instead of pursuing another opportunity.[80] Bywater admittedly "was not happy about it. . . . [But Bywater]

---

[77] JX 335 at SOLAR196453–54; *see also* JX 336; JX 47; JX 52; JX 53.

[78] JX 335 at SOLAR196454.

[79] 07/27/2021 Lundberg Dep. 77:12–84:18.

[80] JX 336.

agreed that it would be great to have [Lundberg] continue to help us during this transition period."[81]

On May 27, 2016, Smart Home sent Lundberg an offer letter.[82] The offer was conditioned on Lundberg's continuing to provide services to Solar on certain outstanding projects during a transition period.[83] The letter also specified that Smart Home would not pay additional compensation to Lundberg for the transition work.[84] Lundberg accepted the offer and joined Smart Home on July 18, 2016.[85] Lundberg agreed to oversee the Solar legal matters to which he had been assigned and to facilitate a smooth transition to his yet-to-be-named replacement.[86]

After Solar hired Jared Fields as Lundberg's replacement on July 27, 2016, Lundberg began transitioning the matters he had overseen to his successor.[87] Lundberg's employment with Solar formally ended on August 21, 2016.[88] Lundberg

---

[81] Bywater Dep. 76:4–78:16; *see id.* (explaining that Bywater "was very upset with what was going on because the entire management team was leaving" but that he was "sure having [Lundberg] help us stabilize was in the best interest of Vivint Solar").

[82] JX 44.

[83] *Id.* at VSH000048.

[84] *Id.*

[85] PTO ¶ 24(h).

[86] Black Decl. ¶¶ 52–53.

[87] *Id.* ¶ 54.

[88] PTO ¶ 24(g).

testified that he continued to work on the SunEdison bankruptcy matter and the securities litigation into late 2017.[89] According to Black, "Lundberg's transition work was completed by the end of December 2016," but he may have provided occasional assistance after that time.[90]

## H. Solar Cancels Lundberg's Awards

When Lundberg's employment with Solar terminated, he possessed 5,247 unvested stock option awards and 2,385 vested stock option awards granted in 2015; 5,247 unvested RSUs and 2,385 vested RSUs granted in 2015; and 88,706 unvested RSUs granted in 2016.[91] Lundberg had engaged in "Exercise and Sell-to-Cover Transactions" upon the vesting of each of the two tranches of RSUs that had vested, selling enough RSUs to cover the taxes associated with vesting of each tranche, leaving him with 1,343 shares as of June 30, 2016.[92] Lundberg also had 16,000 unvested stock option awards and 14,000 vested stock option awards granted in 2014, which are not at issue in this case.[93]

Upon his termination from Solar, Lundberg was removed from Solar's Workday, which then automatically signaled to Morgan Stanley that Lundberg had

---

[89] *See* 07/27/2021 Lundberg Dep. 66:22–67:10.

[90] Black Decl. ¶ 54.

[91] JX 88.

[92] JX 7; JX 8.

[93] JX 88.

18

been terminated.[94] Solar canceled Lundberg's unvested stock options and RSUs in its own system and returned them to the equity award pool available for grant under the 2014 Plan.[95] Solar also canceled Lundberg's vested stock option awards granted under the 2015 Option Agreement after Lundberg did not exercise them within the three-month exercise period after he left Solar.[96]

In its annual report on Form 10-K for the period ended December 31, 2016, Solar disclosed that it had experienced a high forfeiture rate of awards that year due to the departure of several members of the management team.[97] The 10-K did not name Lundberg as one of the key employees who had left.[98]

## I.     Lundberg's Notice of the Cancellation of His Equity Awards

Lundberg's quarterly stock plan summary for the period January 1, 2016 through March 31, 2016, showed that 1,908 shares granted in 2015 had vested and

---

[94] 09/21/2021 Lundberg Dep. 173:6–174:5; Meads Dep. 83:5–11, 83:16–20; 86:7–18.

[95] Black Decl. ¶ 62; JX 100 at JX100.9–10.

[96] Black Decl. ¶ 63; JX 100 at JX100.9–10. Solar contends that this cancellation is reflected Morgan Stanley's records. Pl.'s Opening Tr. Br. 42. The Morgan Stanley records Solar produced in this action do not show that the vested stock options had been canceled—just that their exercise date had been accelerated. JX 88.

[97] JX 126 at SOLAR193651.

[98] *Id*. (reporting only that "[d]uring the year ended December 31, 2016, several of the Company's senior management, including the Company's former CEO, left the Company").

been delivered by Solar.[99] The statements Lundberg received after he left Solar did not reflect that any unvested awards continued to vest or that shares had been delivered upon or within 60 days after the vesting date of any tranche.[100] An "AdHoc Statement"[101] for May 14, 2015 to August 21, 2016, showed that all of Lundberg's unvested RSUs and 21,247 options had been canceled on August 21, 2016; listed November 21, 2016, as the last date to exercise the 2,385 vested stock option awards from the 2015 Option Agreement; and September 20, 2016 as the last date to exercise

---

[99] JX 7; JX 3 at SOLAR000035 (explaining that one fourth of the 7,632 shares—1,908—will vest on the first anniversary of the 2015 Grants). The quarterly Stock Plan Summary for January 1, 2016 to March 31, 2016, shows that Lundberg received all 1,908 shares on March 10, 2016. JX 7 at MS000030.

[100] Lundberg's 2016 Year-End Stock Plan Summary showed that tranches of 1,908 shares and 477 shares with the grant ID of 150514, which corresponds to the May 14, 2015 grant date of the 2015 Grants, were delivered on March 10, 2016, and June 7, 2016, respectively, and that Lundberg engaged in the Exercise and Sell-to-Cover Transactions, but presented no other entries for that year. JX 9; *see also* JX 377 Ex. GG at JX377.41, JX377.43 (showing only that Lundberg's opening balances as of June 30, 2016, and September 30, 2016, and closing balances on September 30, 2016, and December 31, 2016, were all 1,343 shares, and stating that no intermediate transactions had occurred); JX 15 (showing that Lundberg sold his 1,343 Solar shares in that account on July 6, 2017 but not providing any additional information on his Awards or when those 1,343 shares vested).

[101] Black pulled this Morgan Stanley document from Solar's portal to the legacy Morgan Stanley accounts through Solar's new Merrill Lynch's platform as he prepared to respond to Lundberg's demand in July 2020. Black Decl. ¶ 28. This statement was generated on July 30, 2020, and reflects Lundberg's Awards during the period from May 14, 2015 to August 21, 2016, as described above, and is the best evidence in the record of the transactions that occurred within Morgan Stanley's system during that time. JX 88.

14,000 options that had been granted in 2014.[102] The AdHoc Statement, though reflective of Morgan Stanley's internal records, was never sent to Lundberg, and neither it nor any of the statements he received explicitly stated that the vested stock options had been forfeited.[103]

Like the AdHoc Statement, Solar's internal documents indicate that the Awards were canceled when Lundberg moved to Smart Home. An updated capitalization report that included all equity grants as of June 28, 2016, showed that Lindquist forfeited his unvested equity awards and triggered the three-month exercise period when he terminated his employment with Solar.[104] Also, Solar's

---

[102] JX 88. 16,000 of the canceled options and the 14,000 options to be exercised by September 20, 2016, were from the award granted under the 2013 plan and are not at issue in this case.

[103] JX 9 (showing no new vesting in the last two quarters of 2016, but not demonstrating that Lundberg's vested shares were forfeited); JX 15 (showing no new vesting in the third quarter of 2017, but not demonstrating that Lundberg's vested shares were forfeited). Quarterly statements from Lundberg's account showed 1,051 shares in his account at the end of the first quarter of 2016, and then 1,343 at the end of the second quarter. JX 377 Ex. GG at JX377.37, JX377.39. The statements for the third and fourth quarters, however, did not indicate any cancellation or forfeiture, and the 1,343 shares stayed in Lundberg's account for the rest of the year. *Id.* at JX377.41, JX377.43. The statement for the June 30, 2016 to September 30, 2016 period, during which Solar canceled Lundberg's Awards, states "No transactions during this period." *Id.* at JX377.41.

[104] JX 69 at JX69.3–4. Lindquist's shares illustrated by the capitalization report were granted under the 2013 Plan, not the 2014 Plan. *Id.* Garner Meads, Solar's former Director of Equity Compensation, testified that JX 69 was consistent with the way those reports are prepared and the way Meads understood Solar "to be administering the 2014 Plan." Meads Dep. 143:19–144:2; *accord* Black Decl. ¶¶ 43–45. Black oversaw the administration of the 2014 Plan from May 2016 until Solar's acquisition by Sunrun. Black Decl. ¶ 13.

21

February 14, 2017, internal cancellation report showed that all of Lundberg's unvested option awards and RSUs under the 2014 Plan had been canceled, as well as the 2,385 vested stock options.[105]  These internal documents were not accessible or communicated to Lundberg.

On the other hand, Lundberg retained access to his online Solar Morgan Stanley account after he left Solar.  The portal clearly presents outstanding awards upon login.[106]  A record of the logins to Lundberg's account that Morgan Stanley provided in this case shows that, before his employment with Solar terminated in 2016, Lundberg logged into his Morgan Stanley account on five different occasions, for periods lasting between one minute and six-and-a-half minutes.[107]  Then, on August 29, 2016, eight days after he left Solar, Lundberg logged into his account for fourteen minutes.[108]  On October 10, 2016, the Morgan Stanley system recorded two logins, the first lasting approximately four minutes and the second lasting 23 seconds.[109]  On June 15, 2017 and July 3, 2017, the Morgan Stanley system recorded

---

[105] *See* JX 100 at JX100.9–10 (illustrating that 5,247 unvested stock options and 5,247 unvested RSUs of the 2015 Grants, 88,706 RSUs of the 2016 Grant, and 2,385 vested stock options of the 2015 Grants were canceled by Solar).  According to Meads, leaving Solar for employment elsewhere would result in the cancellation of unvested equity awards. Meads Dep. 133:16–22.

[106] JX 18 at SOLAR001249.

[107] JX 19 at JX19.4–5; JX 314 (authenticating JX 19).

[108] JX 19 at JX19.4.

[109] *Id.*

logins after several failures, but did not contain any logout information.[110] On July 6, 2017, the date on which Lundberg sold the remaining 1,343 RSUs that had vested prior to his termination, Lundberg logged into the system twice for about 22 minutes in total.[111] The last login before the dispute leading to this action was on October 9, 2019.[112] Although Lundberg may have had some difficulties in retrieving his account after he left Solar, his contention that he was unable to log in for years and could only log onto the portal around July 2020 was not credible and not supported by the evidence.[113]

### J. Sunrun's Acquisition of Solar and Lundberg's Demand Letter

On July 6, 2020, Solar and Sunrun publicly announced that they had entered into a merger agreement, pursuant to which Sunrun would acquire Solar in a stock-for-stock merger.[114] Solar's stock price increased on the news.[115] The merger closed on October 8, 2020.[116]

---

[110] *Id.* at JX19.3–4.

[111] *Id.* at JX19.3; JX 15 at MS000028.

[112] JX 19 at JX19.3.

[113] 09/10/2021 Lundberg Dep. 56:6–57:19. Solar switched its third-party administrator from Morgan Stanley to Merrill Lynch in 2017. Black Dep. 47:10–18; Black Decl. ¶ 28. Lundberg did not create a Merrill Lynch account because he had left Solar. 07/27/2021 Lundberg Dep. 166:23–167:6.

[114] JX 149 at JX149.41; Black Decl. ¶ 70; JX 39.

[115] JX 39; 02/14/2023 Lindquist Dep. 152:22–153:3.

[116] JX 149 at JX149.41.

On July 23, 2020, between the announcement and the closing of the merger, Lundberg demanded that Solar deliver all his Awards, and on July 28, 2020, he sent a purported notice of exercise of his options.[117] On August 6, 2020, Solar, through outside counsel, sent a letter rejecting Lundberg's demands.[118] Solar took the position that Lundberg had ceased to be a "Service Provider" when he terminated his employment with Solar on August 21, 2016, and therefore had "not been employed by, a consultant for, or a director of the Company Group."[119] The letter also stated that Lundberg's Morgan Stanley account showed that his equity awards were forfeited shortly after his termination date at Solar.[120] Solar indicated that it

---

[117] Neither the July 23 nor the July 28 notices are in the record, but they are referenced in other trial exhibits. *See* JX 107 at Lundberg000184 (stating, in a follow-up letter, that Lundberg had attached "a copy of my July 23, 2020 letter to Vivint Solar, Inc., with reference to my Restricted Stock Unit Agreement under the Vivint Solar, Inc. 2014 Equity Incentive Plan, as well as my Exercise Notice dated July 28, 2020 (collectively the 'Notices')," though the version of the letter produced to the court did not have such attachments); JX 108 (providing Solar's "response to [Lundberg's] July 23, 2020, and July 28, 2020, letters" and explaining Solar's position regarding the Awards and Lundberg's awards under the 2013 Plan). A subsequent September 22, 2020 letter from Lundberg asked that Solar "please consider this letter as my Exercise Notice for the exercise of 7,632 Options at the applicable Exercise Price of $14.15, which have previously vested under my 2015 Option Agreement." JX 135 at Lundberg000951. With the letter, Lundberg purported to deliver the exercise price for all 7,632 of the options under the 2015 Option Agreement, attaching a check for the exercise price of those options and certain options under the 2013 Plan. *Id.* at Lundberg000951–52.

[118] JX 108.

[119] *Id.* at VSLRUT000155.

[120] *Id.* at VSLRUT000154.

believed that the 2014 Plan's plain language supported Solar's interpretation[121] and explained that "[s]ince the Plan's inception, the Plan Administrator has consistently interpreted and administered the Plan and all RSU award agreements in that manner."[122] Lundberg testified that he did not receive the letter until several days later.[123]

### K. Procedural History

On September 29, 2020, Lundberg filed a complaint in the United States District Court for the District of Utah (the "Federal Action") asserting breach of

---

[121] *Id.* at VSLRUT000155–56. Solar's letter correctly quoted the 2014 Plan's definition of "Company Group": "'the Company, any Parent or Subsidiary of the Company and any entity that, from time to time and at the time of any determination, directly or indirectly, is in control of, is controlled by or is under common control with the Company.'" It then informed Lundberg: "Since your VSLR Termination Date, you have not been employed by, a consultant for, or a director of the Company Group. Vivint Smart Home ("VVNT") is not a parent or subsidiary of VSLR. It is not an entity that directly or indirectly is in control of VSLR or controlled by VSLR, and it is not commonly controlled by VSLR." *Id.* Notably, Solar's letter did not claim that Solar and Smart Home were not under common control.

[122] *Id.* at VSLRUT000156 ("[T]he Plan is crystal clear that, when it comes to interpreting that language, the Plan Administrator has sole discretion to interpret that language, and its interpretation in that regard 'is final and binding' on you as a Participant . . . . The Plan is equally crystal clear that, when it comes to transfers among VSLR and members of the Company Group, the Plan Administrator has the right to determine the effect of such a transfer for purposes of the Plan and that such determination will be final and binding."); *see also id.* at VSLRUT000160 ("The Plan is clear that VSLR's grant of those Stock Option Awards to you was voluntary and solely within VSLR's discretion . . . .").

[123] 9/10/2021 Lundberg Dep. 100:7–18. This is consistent with a follow-up letter that Lundberg sent on August 7, 2020, which indicated that he had not heard back from Solar. JX 107.

contract claims against Solar under the 2014 Plan (the "Delaware Claims") and the 2013 Plan.[124] Solar moved to dismiss the Federal Action on several grounds, including for improper venue and lack of federal jurisdiction.[125]

On November 2, 2020, Lundberg filed an Arbitration Demand (the "Arbitration"), alleging the same Delaware Claims against Solar.[126] Again, Solar moved to dismiss for improper venue and lack of subject matter jurisdiction, among other grounds.[127]

On November 16, 2020, Solar filed this action, alleging that Lundberg breached the exclusive Delaware forum provision in the 2014 Plan by filing the Federal Action and the Arbitration.[128] Solar seeks damages and a permanent injunction enjoining Lundberg from prosecuting the Delaware Claims in any forum other than the Delaware Court of Chancery or the United States District Court for

---

[124] Dkt. 19 Ex. 1. The Federal Action also brought claims for, among other things, conversion, negligent misrepresentation, and violations of the Securities Exchange Act of 1934. *Id.* Ex. 1.

[125] *Id.* Ex. 2.

[126] Compl. ¶¶ 10–11, 107.

[127] Dkt. 28 Ex. 7.

[128] *See generally* Compl. Solar also filed a motion to expedite with its complaint, which the court granted on November 25, 2020. Dkts. 2, 20.

the District of Delaware.[129]  Solar also seeks a decree validating the Administrator's interpretation and administration of the 2014 Plan and Solar's decision to forfeit Lundberg's equity awards.[130]

Also on November 16, 2020, Solar moved for a preliminary antisuit injunction,[131] which the court granted on January 20, 2021.[132]  On February 8, 2021, Lundberg filed his Delaware Claims as counterclaims in this action.[133]  In its answer to Lundberg's counterclaims, Solar asserted affirmative defenses, including that the Delaware Claims are time-barred.[134]  Lundberg and Solar agree that, for purposes of determining whether Lundberg's counterclaims are time-barred, those claims were asserted on September 29, 2020—the date on which he filed the Federal Action.[135]

---

[129] Compl. ¶¶ 108–118.

[130] *Id.* ¶ 121.

[131] Dkt. 3.

[132] Dkt. 42.

[133] Dkt. 49.

[134] Dkt. 59.

[135] Def.'s Opening Tr. Br. 6; Pl.'s Opening Tr. Br. 75.

The court held a one-day trial on June 7, 2023.[136]  After the trial, this court requested supplemental submissions, the last of which were received on January 31, 2024.[137]

## II.    ANALYSIS

At the heart of this dispute is whether Solar could and did cancel Lundberg's awards upon the termination of Lundberg's employment with Solar.[138]  Solar argues that it properly exercised its discretion in interpreting the 2014 Plan to permit cancellation of Lundberg's Awards when his employment with Solar ended in August 2016.  Lundberg argues that the Administrator of the 2014 Plan never made such a discretionary decision and that, even if it had, the Company's interpretation is contrary to the plain language of the 2014 Plan.  Specifically, Lundberg maintains that under the plain and unambiguous language of the 2014 Plan, his awards continued to vest as long as he was providing services to a member of the Company

---

[136] Dkt. 175.  The parties stipulated to trial on a paper record, and the day of trial was devoted solely to argument and presentation of designated deposition testimony.  Dkts. 152, 179.

[137] Dkts. 180–82; 186–87.

[138] The Awards consist of three separate grants, each of which Lundberg received under a different agreement.  Though the interpretation of each agreement is independently at issue in this case, the 2014 Plan controls itself and each agreement, so its interpretation is dispositive.  JX 3 Ex. A ¶ 1 (stating that, in the event of conflict between the award agreement and the 2014 Plan, the 2014 Plan controls); JX 4 Ex. A ¶ 1 (same); JX 5 Ex. A ¶ 1 (same).  For the sake of clarity, the court refers only to the 2014 Plan when discussing questions of interpretation pertinent to the Awards.

Group.  Lundberg contends that Smart Home was a member of the Company Group because it and Solar were under the common control of 313 Acquisition.  Therefore, Lundberg insists that his awards continued to vest while he was employed at Smart Home.

The court starts with the substance of the dispute over the terms of the 2014 Plan—Lundberg's counterclaim for breach and Solar's claim for declaratory judgment.  Thereafter, the opinion will address Solar's laches defense and the appropriate measure of damages.  Lastly, the opinion considers the remedies that Solar seeks for Lundberg's filing of claims outside of Delaware in breach of the 2014 Plan's exclusive forum provision.

## A.    Breach of Contract

To prevail on his breach of contract counterclaims, Lundberg must establish by a preponderance of the evidence:  "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."  *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

The parties agree that the 2014 Plan and the agreements underlying each of the Awards are valid and binding contracts.[139] The parties hotly dispute whether Solar breached the 2014 Plan. Fundamentally, these claims turn on whether Smart Home is a member of the "Company Group," as that term is defined in the 2014 Plan. Company Group is defined to include "any entity that . . . directly or indirectly . . . is under common control with" Solar.[140] Solar argues that it did not breach the 2014 Plan because the Administrator exercised its discretionary authority to interpret the 2014 Plan so as to require forfeiture of Lundberg's awards upon the termination of his employment with Solar, meaning that Smart Home is not part of the Company Group. Solar insists that its interpretation is final and binding upon Lundberg.

A significant threshold question is whether Solar's decision to cancel Lundberg's RSUs and options upon his termination of employment with Solar is entitled to any deference. Lundberg argues that it is not because there is no evidence that the *Administrator* ever interpreted the 2014 Plan as Solar has in this litigation. Lundberg argues that, under the plain and unambiguous language of the 2014 Plan, Smart Home is under common control with Solar and, therefore, his awards could

---

[139] PTO ¶ 24(f).
[140] JX 2 § 21(j).

30

not be terminated without his written agreement, which he did not give.[141] The court first addresses whether the Administrator interpreted the 2014 Plan or made a discretionary determination that is entitled to deference.

### 1. The Administrator made no determination that Smart Home was outside the definition of Company Group.

The 2014 Plan grants to the Administrator "the authority, in its sole discretion to make any determinations deemed necessary or advisable to administer the [2014] Plan."[142] According to the 2014 Plan, the Administrator's "decisions, determinations and interpretations will be final and binding on all Participants."[143] Solar argues that under this court's caselaw, the Administrator's discretionary decisions should be accorded deference, and that Solar's decision to cancel Lundberg's awards entitles Solar to a judicial declaration confirming its interpretation of the 2014 Plan.

Solar consistently employed a practice of terminating awards under the 2014 Plan when plan participants stopped working at Solar or one of its subsidiaries.[144]

---

[141] *See id.* § 18(c) ("Subject to [exceptions not applicable here], no amendment, alteration, suspension or termination of the Plan or an Award under it will materially impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, *which agreement must be in writing and signed by the Participant* and the Company." (emphasis added)).

[142] *Id.* § 3(b).

[143] *Id.* § 3(i).

[144] Black Decl. ¶¶ 38–39.

Solar's IPO Prospectus,[145] the 2014 Plan Prospectus,[146] and statements by Solar

employees[147] either directly confirm or do not contradict this practice. Solar

---

[145] JX 20. Solar's IPO Prospectus indicated that the Compensation Committee's administration of the 2014 Plan was subject to the 2014 Plan's provisions. *Id.* at SOLAR001529. It also stated that stock options' sunset exercise period in their award agreement is triggered "[a]fter the termination of service of an employee, director or consultant" and that, for RSUs, the Administrator "may impose whatever conditions to vesting it determines to be appropriate (for example, the administrator may set restrictions based on the achievement of specific performance goals or continued service to us)." *Id.* Solar's briefing in this case emphasizes that "[n]owhere in Solar's IPO Prospectus' representations regarding the 2014 Plan does it state that continued service also may be with SmartHome." Pl.'s Opening Tr. Br. 16–17.

[146] JX 21. The 2014 Plan Prospectus presents 56 questions and answers about the 2014 Plan. *Id.* Award recipients were required to read and sign the 2014 Plan Prospectus to accept their awards. JX 11 at SOLAR000474; JX 17 at SOLAR000396. Among other things, the 2014 Plan Prospectus states that "termination of status" will occur "at midnight at the end of the last day in the primary work location in which you are actively providing services to the Company or any parent or subsidiary of the Company." JX 21 at SOLAR001094. Phrased slightly differently from the 2014 Plan's Termination of Status Date, the Prospectus's Termination of Status presents Solar's narrower interpretation.

[147] For example, Lindquist emailed White and Sara Spengler, the Director of Equity Compensation, template language for award offer letters under the 2014 Plan, which stated that "[a]ll vesting shall be subject to your continued employment with the Company through applicable vesting dates." JX 27 at SOLAR217142–43. This language was then used in the offer letters that White sent to employees. *See, e.g.*, JX 29 at SOLAR230124; JX 12 at SOLAR001347; JX 22 at SOLAR001117; JX 59 at SOLAR233028. Lindquist also recommended that the educational webinar presenting the 2014 Plan to grantees state that an award "terminates if you leave Vivint Solar." JX 32 at SOLAR210525. The final draft of the webinar stated that "[a]ll vesting is subject to continued service on the applicable vesting dates." JX 37 at SOLAR210595. Lundberg attended the webinar. 07/27/2021 Lundberg Dep. 157:22–159:4. A later-developed presentation included the same representation but cautioned that the 2014 Plan's terms controlled. JX 74 at SOLAR000478–79, SOLAR000488. Additionally, Bywater, the architect of the 2016 retention awards, understood the term "Service Provider" to be an employee of Solar, and stated that he "wasn't going to award them for leaving." Bywater Dep. 133:6–136:3.

followed this practice even for other employees who, like Lundberg, left Solar to work for Smart Home.[148]

Although Solar demonstrated a consistent practice of forfeiting unvested awards upon a recipient's termination of employment with Solar or its subsidiaries, the Company did not present any persuasive evidence that the Administrator ever made a determination to this effect, either generally or in a specific instance. Indeed, the evidence revealed that no such decision was made.

The logical starting point is the records of the Administrator, which in this case is the Compensation Committee. To its credit, the Compensation Committee kept detailed minutes that reflect discussions about the 2013 Plan and 2014 Plan and multiple resolutions documenting Compensation Committee decisions to administer the plans and to grant awards.[149] These minutes evince the Compensation Committee's care in recording its decisions, a practice to be commended. But these minutes and resolutions do not show that the committee ever exercised its discretion as Solar claims in this litigation. Nor has Solar presented evidence of the Board or

---

[148] *See, e.g.*, JX 69 at JX69.3–4 (showing that Solar terminated Lindquist's awards under the 2013 Plan when he moved to Smart Home).

[149] JX 25 at SOLAR230233 (discussing the consulting firm that the Compensation Committee engaged to advise them on the equity incentive program); JX 26 at SOLAR230237–40 (discussing and adopting a resolution approving equity incentive awards under the 2014 Plan); JX 28 at SOLAR230254–56 (same); JX 38 at SOLAR230267–68 (same).

Compensation Committee having requested or been presented with legal advice on the interpretation of "Company Group" prior to or in connection with the cancellation of Lundberg's awards.[150]

Beyond the documentary record, no Compensation Committee member could recall the committee having ever discussed the provisions of the 2014 Plan that are at issue in this case.[151] For example, Black, a member of Solar's legal team

---

[150] Section 11(a) of the 2014 Plan provides: "Unless otherwise provided by the Administrator, a Participant will not cease to be an Employee in the case of . . . any transfer between locations of the Company or other members of the Company Group." JX 2 § 11(a). There is no evidence of the Administrator's having "otherwise provided" with respect to Lundberg's moving to Smart Home, and the court finds it made no such determination.

[151] *See, e.g.*, Wallace Dep. 29:7–31:10 (Compensation Committee member) ("Q: Do you have a recollection of ever discussing, in connection with either the board of directors or the compensation committee of Vivint Solar, the meaning of common control? . . . A: No."); *id.* at 42:8–15 ("Q: Do you have a recollection of parsing the words of any provision or any definition within any of the equity plans of Solar, yes or no? . . . A: No, I don't."); D'Allesandro Dep. 19:4–22 (Compensation Committee member) ("Q: Do you have a recollection in connection with the Vivint Solar equity plans ever addressing or discussing the meaning of, 'common control,' under those plans? . . . A: I have no recollection."); *id.* at 19:24–20:7 ("Q: In connection with the Vivint Solar plans do you recall addressing the issue of vesting when an individual transferred between the [sic] Vivint Solar and Vivint Smart Home? . . . A: I -- I don't ever remember people talking about transfers between the companies, one. And two, I have no recollection of any -- any such discussion."); *id.* at 40:11–18 ("Q: Do you have any recollection of the compensation committee at Vivint Solar addressing equity awards provided to Jim Lundberg? . . . A: I -- I have no such recollection one way or the other."); *id.* at 41:19–24 ("Q: Do you have a recollection of the compensation committee ever discussing a specific term or provision of any [sic] Vivint Solar's equity plans? . . . A: I -- I do not recall."); *id.* at 42:9–14 ("Q: Do you recall the Vivint Solar compensation committee ever exercising its discretion with respect to an interpretation of the plan documents? . . . A: I -- I don't recall one way or the other.").

throughout the 2014 Plan's administration and Solar's Chief Legal Officer from 2017 to 2020,[152] could not remember any exercise of discretion by the Compensation Committee other than the granting of new equity awards.[153]

The court concludes that the Administrator made no actual decision to interpret the 2014 Plan as Solar claims in this litigation. Because the Administrator made no such decision, there is no decision to which any deference is owed.[154]

---

[152] Black Decl. ¶¶ 5–10.

[153] Black Dep. 54:11–25 ("Q: Do you have a recollection of any occasion where the compensation committee exercised discretion in connection with the equity plans? . . . A: Yes. To the extent that granting of equity is an example of discretion. Q: Okay. Other than the granting of equity do you recall any other exercise of discretion? . . . A: Nothing comes to mind.").

[154] This opinion does not address whether a decision of the Administrator to interpret the 2014 Plan is entitled to deference. Historically, this court has enforced discretionary acts of plan administrators that are not inconsistent with a plan that grants them final discretionary authority. *See Maher v. N.E.C.A. - Loc. Union No. 313 I.B.E.W. Pension Tr. Fund*, 1978 WL 4954, at *2 (Del. Ch. May 30, 1978) ("Section 9.1 of the Plan does provide that decisions of the Trustees in administering the Plan shall be final, and therefore this Court must give deference to the decision of the trustees denying plaintiff a pension inasmuch as the decision was based on a reasonable application of the Plan's provisions."); *Friedman v. Khosrowshahi*, 2014 WL 3519188, at *6–10 (Del. Ch. July 16, 2014) (declining to find that discretionary plan administration that was consistent with the language of the plan was not in good faith or constituted an uninformed decision), *aff'd*, 2015 WL 1001009 (Del. Mar. 6, 2015); *Stemerman v. Ackerman*, 184 A.2d 28, 32–34 (Del. Ch. 1962) (enforcing a stock option committee's administration of a plan where the court found two exercises of discretion, one consistent with the plain language of the plan and the other a reasonable interpretation of the plan); *W.R. Berkley Corp. v. Hall*, 2005 WL 406348, at *4 (Del. Super. Feb. 16, 2005) ("[W]hen a stock option committee is vested with final, binding and conclusive authority to determine a participant's right to receive or retain benefits, that decision made in accordance with the provisions of the agreement will not be second guessed by the Court absent a showing of fraud or bad faith."). But a recent

### 2. The Awards continued to vest while Lundberg was employed by Smart Home.

#### a. The plain language of the 2014 Plan allows continued vesting and nonforfeiture of Awards held by employees of entities under common control with Solar.

The 2014 Plan and the Awards are construed under "well-established principles of contract interpretation." *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1043 (Del. 2023); *accord Terrell*, 297 A.3d at 619 (applying "traditional principles of contract interpretation" to the terms of a stock option agreement). "Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted). The court must read the contract as a whole and "enforce the plain meaning of clear and unambiguous language." *Manti Hldgs., LLC v. Authentix Acquisition Co.,* 261 A.3d 1199, 1208 (Del. 2021). If the contract is unambiguous, the court will give effect to the plain meaning of its terms. *Id.* "A contract is not

---

decision of the Delaware Supreme Court could be read to suggest that a committee's decision on a pure question of law, such as interpreting an equity incentive plan, is entitled to no deference. *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 623 (Del. 2023) ("[T]he Committee was assigned the authority to 'interpret the meaning of a legal document'—the Stock Option Agreement. As a question of law, the Committee's contractual interpretation was subject . . . to *de novo* review."); *see Sanders v. Wang*, 1999 WL 1044880, at *7–9 (Del. Ch. Nov. 8, 1999) (finding that an administrator's purported exercise of discretion in a manner contrary to the unambiguous language of the governing plan was invalid). Although the parties have briefed the issue, the court is not required to reach it, and the court declines to do so in *dicta*.

rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

Lundberg's Awards at issue in this case provide:

> Any [securities] that have not vested as of the time of Participant's termination as a Service Provider will cease vesting and will revert to the Plan on the 30th day following the Termination of Status Date. The date of Participant's termination as a Service Provider is detailed in Section 3(c) of the Plan.[155]

The 2014 Plan defines a "Service Provider" as "an Employee, Director or Consultant."[156] It defines "Employee" as "any person . . . employed by the Company or any member of the Company Group."[157] But it also makes an important

---

[155] JX 3 Ex. A ¶ 5 (cleaned up); JX 5 Ex. A ¶ 5 (same); JX 4 Ex. A ¶ 5 (same other than the above omitting "immediately" before "will cease vesting"); *see also* JX 3 Ex. A ¶ 3 ("Shares scheduled to vest on a date or upon the occurrence of a condition will not vest unless Participant continues to be a Service Provider beginning on the Grant Date through the date that the vesting is scheduled to occur."); JX 5 Ex. A ¶ 3 (same); JX 4 Ex. A ¶ 2 (same); JX 3 at SOLAR000035 ("If Participant ceases to be a Service Provider for any or no reason before Participant vests in the Restricted Stock Units, the unvested Restricted Stock Units will immediately terminate."); JX 5 at SOLAR000054 (same); JX 4 at SOLAR000043 ("If Participant ceases to be a Service Provider for any or no reason before Participant fully vests in the Option, the unvested portion of the Option will immediately terminate.").

[156] JX 2 § 21(kk).

[157] *Id.* § 21(m).

distinction. The 2014 Plan specifies that, for Incentive Stock Options ("ISOs"),[158] "an Employee must be employed by the Company or any Parent or Subsidiary of the Company."[159] Thus, the drafters of the 2014 Plan determined that ISOs would terminate when the employee was no longer employed by Solar or any parent or subsidiary of Solar. As to other awards, however, vesting would not terminate if a Service Provider was employed by a member of the Company Group.

Under the 2014 Plan, Lundberg's status as a Service Provider and, therefore, his "right to vest in any Award under the Plan w[ould] cease as of the Termination of Status Date."[160] The "Termination of Status Date" is defined as "midnight at the end of the last day in the primary work location in which [Lundberg] actively provides services for a member of the Company Group."[161] The "Company Group" is "the Company, any parent or Subsidiary of the Company, and any entity that, from time to time and at the time of any determination, directly or indirectly, is in control of, is controlled by or is under common control with the Company."[162] All of the

---

[158] Under the 2014 Plan, ISOs were options subject to additional qualifications and limitations. *Id.* §§ 4(d), 21(s). Lundberg did not receive any ISOs. *See id.* § 4(a); JX 4.

[159] JX 2 § 21(m).

[160] *Id.* § 3(c)(iii).

[161] *Id.* § 3(c)(i).

[162] *Id.* § 21(j).

awards at issue in this case provide that in the event of any conflict between the award and the 2014 Plan, the terms of the 2014 Plan control.[163]

Solar reads the term Company Group narrowly to mean only Solar or its subsidiaries. Under that reading, according to Solar, Lundberg's Termination of Status Date under the terms of the 2014 Plan was August 21, 2016, the same date that his employment with Solar terminated. Lundberg argues that his Termination of Status Date was not August 21, 2016, because at that time and thereafter he was actively employed by a member of the Company Group, *i.e.*, Smart Home.

Solar's reading of the Plan is not a reasonable one. First, it violates the canon against surplusage. "Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court." *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008); *see also Manti Hldgs.*, 261 A.3d at 1208 ("Contracts will be interpreted to give each provision and term effect and not render any terms meaningless or illusory." (internal quotation marks omitted)). Solar reads the following key language out of the definition of Company Group: "any entity that, from time to time and at the time of any determination, directly or indirectly, is in control of, is

---

[163] JX 3 Ex. A ¶ 1 ("If there is a conflict between the Plan and this Agreement, the Plan will prevail."); JX 4 Ex. A ¶ 1 (same); JX 5 Ex. A ¶ 1 (same).

39

controlled by or is under common control with the Company." Recognizing that its reading of the 2014 Plan ignores this language, Solar urges the court not to apply the canon against surplusage, citing caselaw which notes that the canon is "not a technical rule of law designed to trap a careless draftsperson." *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006). Solar argues that, instead of looking to the plain language of the 2014 Plan, the court should instead look to its intent and the purposes of the plan. The 2014 Plan identifies the "Purposes of the Plan" as "to attract and retain personnel for positions with the Company, to provide additional incentive to Employees, Directors, and Consultants [], and to promote the success of the Company's business."[164] Solar asserts that an interpretation that awards under the 2014 Plan would continue to vest after a Solar employee moves to another company is contrary to the 2014 Plan's purpose.

This court eschews the rule against surplusage only if its application would produce absurd results. *See Majkowski*, 913 A.2d at 588, 588–89 (declining "an extreme application" of the rule against surplusage that would have "ben[t] contract language to read meaning into the words that the parties obviously did not intend"). But application of the rule in this case would not produce an absurd result, and the definition of Company Group, in its entirety, does not reflect careless drafting. The

---

[164] JX 2 § 1.

plain language of this provision confirms that the drafters intended the term Company Group to have meaning. It is a defined term. In addition, the definition of Employee shows that the drafters rejected the interpretation that Solar advocates. The 2014 Plan expressly provides that an Employee is a person "employed by the Company *or* any member of the Company Group."[165] But it goes on to state that "with respect to [ISOs], an Employee must be employed by the Company or any Parent or Subsidiary of the Company."[166] This distinction shows that the drafters intended that awards other than ISOs would continue vesting if a Participant continued to work for one of Solar's siblings. The drafters were careful, not careless.

Nor is this result contrary to the purpose of promoting the overall success of Solar's business. Solar and its CEO had this in mind when they persuaded Lundberg to stay "in the family" by moving to Smart Home and continuing to perform services for Solar for no additional compensation.[167] Therefore, the court reads the term Company Group "in a way that does not render any provisions illusory or

---

[165] *Id.* § 21(m) (emphasis added).

[166] *Id.*

[167] JX 335; JX 336; JX 44 at VSH000048. Additionally, when Solar was first formed, it relied on Smart Home for "back-office type purposes" including "software, infrastructure, things like that." Black Dep. 108:14–22. The companies later entered into a series of "Intercompany Agreements" that referred to Solar and Smart Home as "affiliate business entities" in their recitals and provided for, among other things, co-marketing of their respective product lines and licensing of the Vivint trademark and assignment of associated goodwill. JX 324 at SOLAR019882, SOLAR019886–88; JX 325; JX 326.

41

meaningless." *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (internal quotation marks omitted). The 2014 Plan provides that vesting stops once a Service Provider is no longer employed by Solar, a parent or subsidiary of Solar, *or* any entity under common control with Solar.

### b. Solar and Smart Home were under common control throughout the Awards' vesting periods.

If Solar and Smart Home were under common control at the time Lundberg left Solar to join Smart Home, then Lundberg's awards would continue to vest while he actively provided services to Smart Home. Although the phrase "under common control" is not defined under the 2014 Plan, that does not render the phrase ambiguous. *See AT&T Corp. v. Lillis*, 953 A.2d 241, 253 (Del. 2008) ("Delaware courts have found other terms, undefined by the contract and undefined under Delaware law, to be unambiguous."); *see also Sycamore P'rs Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 4130631, at *16 (Del. Super. Sept. 10, 2021) ("The term 'non-monetary relief' is not defined. But context clarifies its meaning."); *Bitgo Hldgs., Inc. v. Galaxy Digital Hldgs., Ltd.*, No. 219, 2023, slip op. at 22 (Del. May 22, 2024) ("Language from a contract need not be perfectly clear for an interpretation of it to be deemed as the only reasonable one."). Lundberg argues that Solar and Smart Home were under the common control of 313 Acquisition at all relevant times because it is undisputed that 313 Acquisition owned at least 50% of outstanding common stock and voting power of both entities. Solar concedes that

313 Acquisition owned a majority of the outstanding stock of both entities, but argues that majority ownership, standing alone, does not place Solar and Smart Home under common control.

Lundberg maintains that, when viewing the 2014 Plan as a whole, the parties intended control to mean ownership of at least 50% of an entity's outstanding stock. Specifically, Lundberg points to Section 21(e)(i) of the 2014 Plan, which defines "Change in Control" as occurring when a "Person"[168] "acquires ownership of the stock of the Company that, with the stock held by such Person, constitutes more than 50% of the total voting power of the stock of the company . . . ."[169] This synthesis of terms is a reasonable interpretation of the 2014 Plan's plain language.[170]

---

[168] Defined as "any one person, or more than one person acting as a group." JX 2 § 21(e)(i).

[169] *Id.*

[170] Under the 2014 Plan, a Change in Control could also occur upon, over a 12-month period, replacement of a majority of the Board by directors not nominated by the existing board or a change in ownership of assets having at least 50% of the value of the Company's prior assets. *Id.* §§ 21(e)(ii)–(iii). Though both parties discussed § 21(e)(i), see Pl.'s Opening Tr. Br. 66, Def.'s Answering Tr. Br. 27, and Def.'s Post Tr. Br. 14–15, neither party addressed §§ 21(e)(ii)–(iii) in their briefing or at argument. The additional definitions also support Lundberg's position that ownership of a majority of the Company's stock constitutes control. Replacing a majority of the Company's board without its consent, as contemplated by § 21(e)(ii), would require action by a majority of the Company's voting stock, and § 21(e)(iii) specifically exempts from a "Change in Control" any transfers of assets to "an entity controlled by the Company's stockholders immediately after the transfer" and "a Person, that owns, directly or indirectly, 50% or more of the total value or voting power of all the outstanding stock of the Company"—indicating that, under the 2014 Plan, assets so transferred are still considered as being under unchanged control.

Lundberg's reading of the term control is also consistent with Delaware fiduciary law. "Delaware courts will deem a stockholder a controlling stockholder when the stockholder: (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but 'exercises control over the business affairs of the corporation.'" *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018) (emphasis omitted) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)); *see also In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) ("Under our law, a controlling shareholder exists when a stockholder: 1) owns more than 50% of the voting power of a corporation; or 2) exercises control over the business and affairs of the corporation."); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("A shareholder is a 'controlling' one if she owns more than 50% of the voting power in a corporation . . . .").

Solar contends that the phrase "under common control" has not been defined under Delaware law and points to *Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499 (Del. 2005), where the Court observed:

> [T]he term "control" does not have a fixed legal meaning. Its definition varies according to the context in which it is being considered, *e.g.*, fiduciary responsibility, tort liability, filing consolidated tax returns, sale of control. For that reason, "control"—or its absence—is frequently used to describe a judicial conclusion that is reached after a fact specific analysis.

44

*Id.* at 506–07. Solar argues that under *Weinstein*, mere majority ownership does not constitute control. Solar's argument oversimplifies the *Weinstein* decision, which does not support Solar's position in this case.

In *Weinstein*, the Delaware Supreme Court addressed whether, under Section 220 of the Delaware General Corporation Law (the "DGCL"), a corporation was required to produce for inspection documents of a less-than-wholly-owned subsidiary. The Court first addressed the definition of "subsidiary" in Section 220.[171] The Court held that the question of whether an entity was a subsidiary under the statute "must be determined by applying the concept of control normally used for the purpose of imposing fiduciary responsibility" under Delaware law. *Weinstein*, 870 A.2d at 508. Therefore, mere ownership of a majority of the voting power constituted control under that portion of the statute. The Court then considered another subsection of the statute, which permitted a stockholder to inspect documents of the subsidiary "'to the extent that . . . [t]he corporation could obtain such records through the exercise of control over such subsidiary.'" *Id.* (quoting 8 *Del. C.* § 220 (b)(2)(b)). The Court held that the "fiduciary definition"

---

[171] "'Subsidiary' means any entity directly or indirectly owned, in whole or in part, by the corporation of which the stockholder is a stockholder and over the affairs of which the corporation directly or indirectly exercises control . . . ." 8 *Del. C.* § 220(a)(2). At the time of the *Weinstein* opinion, the definition of subsidiary was contained in subsection (a)(3).

of control did not carry over to Section 220(b)(2)(b), which required actual exercise of control to cause the subsidiary to produce its books and records. *Id*. at 509. Thus, the use of term control in "quite different contexts" within the same statute rendered the statute ambiguous. *Id*.

Unlike in *Weinstein*, the 2014 Plan does not use the term control in different contexts. Nor does the 2014 Plan contemplate any action by 313 Acquisition in connection with the issuance of awards or their vesting. Construing "common control" to mean mere ownership of a majority of the voting power of Solar and Smart Home is consistent with the drafters' use of the term "control" in Section 21(e), which reflects the only definition of control found in the contract. It is also consistent with the fiduciary definition of control under Delaware law, which governs the 2014 Plan. Viewing the 2014 Plan as a whole, under the plain and unambiguous language of the contract, the term control as used in the definition of Company Group means ownership of 50% of the voting power of an entity. That is the only reasonable reading of the language of the contract.[172]

---

[172] Solar urges the court to interpret "common control" using 26 C.F.R. § 1.414(c)-2, an Internal Revenue Code regulation that treats a "controlling interest" as arising upon control of at least 80% of either the voting power of a company or at least 80% of each class of its stock. Under that definition, Solar and Smart Home would not have been under common control at any point relevant to the vesting of the Awards. Solar then suggests that the court consider a free-floating inquiry into the definition of control by pointing to the

It is uncontested that 313 Acquisition owned more than 50% of the voting power of Solar and Smart Home until at least August 5, 2020. Because 313 Acquisition owned more than 50% of the voting power of Solar and Smart Home at

definition of control under Rule 405 governing the Securities Act of 1933. *See* 17 C.F.R. § 230.405 (defining control to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise"). Solar argues that the question of control under the federal regulations "is based on the totality of the circumstances, including an appraisal of the influence upon management and policies of a corporation by the person involved." Pl.'s Post Tr. Br. 55 (internal quotation marks omitted). Solar argues that applying this test, the circumstances here show that Smart Home was not under common control with Solar.

These authorities are not referenced in the 2014 Plan in connection with the definition of Company Group, and they cannot create ambiguity in an unambiguous contract. *See Rhone-Poulenc*, 616 A.2d at 1196 ("[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. . . . Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."). If the drafters wanted to import a definition from a federal statute or regulation, they knew how to do so. *See*, *e.g.*, JX 2 § 21(x) (defining "Parent" as "a 'parent corporation,' whether now or hereafter existing, as defined in [Internal Revenue] Code Section 424(e)"). The court will not superimpose terms the contracting parties could easily have employed but eschewed. *See Sanders*, 1999 WL 1044880, at *9 (declining to add a term to the plan at issue where other plans demonstrated that the drafters "knew how to authorize this type of material alteration when they so desired"); *cf. Am. Legacy Found. v. Lorillard Tobacco Co.*, 2005 WL 5775806, at *11 (Del. Ch. Aug. 22, 2005) (presuming an "implicit agreement by the parties to avoid the use of legal terms of art" where sophisticated parties included two critical phrases "that have no accepted blackletter legal definition"). Nor is there any evidence that any of these authorities were ever presented to the Administrator in connection with interpreting or applying the term Company Group. Additionally, to the extent Solar's reading of the agreement could be said to create ambiguity—and the court concludes it does not—Solar does not address the question of whether any ambiguity should be construed against Solar, as the drafter of the 2014 Plan. *Cf. Weinberg*, 294 A.3d at 1061 (noting that the Court did not need to reach the issue of whether the terms of an equity incentive plan should be construed against the drafter because the terms were unambiguous).

47

all relevant times, 313 Acquisition controlled both entities. Therefore, Solar and Smart Home were under common control at the time Lundberg became an employee of Smart Home and terminated his employment with Solar.

The court finds that Lundberg was employed by Solar or by Smart Home throughout the vesting period for his Awards. By working at Solar or a company under common control with Solar, he was working for a member of the Company Group throughout the vesting periods and was an Employee under the terms of the 2014 Plan. As an Employee, he maintained his Service Provider status, and the Termination of Status Date did not occur prior to the vesting of each of his Awards. Therefore, the Awards continued to vest and could not have been forfeited. Accordingly, Solar is not entitled to declaratory judgment with respect to its interpretation, and Lundberg is entitled to appropriate damages for those counterclaims that are not time-barred.[173]

---

[173] Lundberg also argued that he was entitled to continued vesting for some of his Awards because he was a "Consultant," as defined under the 2014 Plan, during the period in which he provided transitional services for Solar. Solar argues that Lundberg was not a Consultant, emphasizing that it and Lundberg never entered into a formal agreement. The court need not reach this issue because it has already determined that Lundberg qualified for continued vesting as an "Employee," as defined under the 2014 Plan.

### 3. Some of Lundberg's counterclaims are time-barred.

Solar argues that Lundberg's breach of contract claims under the 2015 RSU Agreement and 2016 RSU Agreement (the "RSU Agreements") are time-barred.[174] Solar bears the burden of proving all elements of this affirmative defense by a preponderance of the evidence. *Slovin v. Knotts*, 1980 WL 268097, at *2 (Del. Ch. Dec. 5, 1980).[175]

---

[174] Solar, in its posture as the plaintiff, also seeks a declaration to this effect. The relevant burdens and arguments are identical. For the sake of clarity, the court refers only to the affirmative defense in its analysis.

[175] Solar did not present any argument on this defense with respect to the 2015 Option Agreement in its trial briefing. In its argument on its laches defense, Solar only ever referred to the RSU Agreements, and only identified the size and vesting schedule of the RSU awards. *See, e.g.*, Pl.'s Opening Tr. Br. 69 ("The below chart sets forth the vesting and delivery dates of the allegedly vested RSUs granted under the 2015 RSU Agreement: . . . ."); *id.* at 68 ("Lundberg, in his counterclaims, alleges Solar breached the 2015 RSU Agreement and 2016 RSU Agreement by failing to deliver to him the stock underlying the RSU equity awards when he demanded it and seeking as damages the value of the stock underlying those RSU awards ('RSU Counterclaims'). However, those RSU Counterclaims are barred by Delaware's one-year statute of limitations, 10 *Del. C.* § 8111."); Pl.'s Answering Tr. Br. 68 (arguing, with respect to Solar's limitation defense, only that "All of Lundberg's RSU Counterclaims based on his 2015 RSU Agreement and 2016 RSU Agreement are barred by Delaware's one-year statute of limitations in 10 Del. Code § 8111, as Solar demonstrated in its Opening Trial Brief. *See* Transaction ID 69968687, 68-7. Lundberg's RSU Counterclaims are to recover a benefit from Solar that he allegedly earned for work he already performed. According to Lundberg, there is no further work he needs to perform to receive the benefit of the stock underlying his RSU equity awards. Therefore, under Delaware's temporal test, § 8111 applies to Lundberg's RSU Counterclaims, barring those RSU Counterclaims because they were not filed within one year of accruing. *Id.*" (emphasis omitted)). Lundberg's argument as to the statute of limitations defense focused solely on the RSU awards, noting that "Solar's limitations argument does not apply to Lundberg's stock option claims." Def.'s Answering Tr. Br. 55

"Although the limitations of actions applicable in a court of law are not controlling in equity, the Court of Chancery ordinarily will follow the applicable statute of limitations." *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177 (Del. 2011) (internal quotation marks omitted). Where a party has asserted "a legal claim seeking legal relief in the Court of Chancery, the statute of limitations (and its tolling doctrines) logically should apply strictly and laches should not apply." *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 983 (Del. Ch. 2016). Yet "extraordinary circumstances may provide an exception to the strict application of statutes of limitations for purely legal matters, separate and apart from the application of tolling doctrines." *Id.*; *see also id.* at 977–78 (citing *IAC*, 26 A.3d at 175–76, 178, and *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 767–68, 770–72 (Del. 2013)).

---

n.134. Solar's subsequent filings did not contend otherwise, nor did its counsel argue that these counterclaims were time-barred at oral argument or in its post-trial briefing. *See* Tr. 7:1–4 (Solar's Counsel) ("Solar further has proved with overwhelming evidence that all Lundberg's counterclaims based on his RSU agreement [sic], 2015 and 2016, are time-barred . . . ."); *id.* at 34:5–6, 34:12 (Solar's Counsel) ("His 2015 RSU agreement and option agreement . . . . [A]gain, that's Exhibits 3 and 4."); *see generally* Pl.'s Post Tr. Br. "An affirmative defense is '[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's . . . claim.'" *Emerald P'rs v. Berlin*, 787 A.2d 85, 91–92 (Del. 2001) [hereinafter "*Emerald II*"] (alterations in original) (quoting Black's Law Dictionary 430 (7th ed. 1999)); *see Slovin*, 1980 WL 268097, at *2 ("[S]tatute[s] of limitations . . . and laches are affirmative defenses"). Here, Solar has not presented argument on its affirmative defense regarding the timeliness of the 2015 Option Agreement. Therefore, the court concludes that Solar has abandoned its affirmative defense of the statute of limitations with respect to the 2015 Option Agreement. *Emerald I*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

50

Lundberg's breach of contract counterclaims are legal claims seeking money damages—a legal remedy. Absent extraordinary circumstances, the applicable statutory limitations period will apply.

The parties have jousted over several alternative statutes of limitations with respect to the RSU awards. Solar argues that Lundberg's counterclaims are subject to a one-year statute of limitations under 10 *Del. C.* § 8111. Lundberg argues that his counterclaims are subject to no limitations period, but if they are, then Utah's six-year statute of limitations governing contracts, *Utah C.* § 78B-2-309(1)(b), should apply. Alternatively, each side argues that if their favored limitations period does not apply, then Delaware's three-year limitations period for contract actions, 10 *Del. C.* § 8106, should govern.

> **a.    There are no extraordinary circumstances warranting departure from applying an analogous Delaware limitations period.**

"The time fixed by the statute of limitations is deemed to create a presumptive time period for purposes of the Court's application of laches absent circumstances that would make the imposition of the statutory time bar unjust." *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 77 (Del. Ch. 2013).

Lundberg argues that the unusual or extraordinary circumstances of this case require departure from applying the statute of limitations by analogy, relying solely on this court's decision in *Juran v. Bron*, 2000 WL 1521478 (Del. Ch. Oct. 6, 2000).

51

*Juran* is inapposite. The claims in *Juran* were filed in Delaware, but the applicable contract was governed by California law. *Id*. at *11. Under California law, the applicable limitations period was four years. The court concluded that the California choice of law provision did not require the court to apply the California statute of limitations by analogy, noting that choice of law provisions "will only include the statute of limitations of the chosen jurisdiction if their inclusion is specifically noted." *Id*. The court also declined to apply Delaware's one-year period under 10 *Del. C.* § 8111. Rather, the court ultimately selected a two-year period because the "special or unusual circumstances" presented in that case would make it "inequitable to apply the statute of limitations at law." *Id*. Unlike in *Juran*, where California law governed the underlying claims but Delaware provided the procedural law as the forum, Delaware law governs both the substantive and procedural law in this case.

To determine whether "unusual conditions or extraordinary circumstances" warrant a departure from the presumptive limitations period, Delaware courts consider several factors:

> 1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; 2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; 3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; 4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and 5) whether, at the time this litigation was filed, there was a bona fide dispute as to the validity of the claim.

*IAC*, 26 A.3d at 178; *see also Levey*, 76 A.3d at 770–772 (finding "unusual conditions and extraordinary circumstances" warranting non-application of the statute of limitations where four of the five *IAC* factors favored such a finding).

Lundberg does not grapple with the *IAC* factors, which the court finds do not support disregarding the application of a limitations period. To the extent any of the factors support deviating from the analogous statutory period, the parties have already agreed that Lundberg's claims were asserted on September 29, 2020, the date that he first raised them in Utah.[176] No unusual or special circumstances exist in this breach of contract action that warrant departing from the application of a statute of limitations period by analogy. The question for the court is which statutory period to apply.

Lundberg argues that if the court applies a statutory limitations period, then it should apply the six-year Utah statute of limitations for breach of contract because the factual nexus of this case is in Utah. Solar counters that the court must look to Delaware law for the statute of limitations.

"[T]he general rule is that the forum state's statute of limitations applies." *TrustCo Bank v. Mathews*, 2015 WL 295373, at *5 (Del. Ch. Jan. 22, 2015) (internal quotation marks omitted); *see also CHC Invs., LLC v. FirstSun Cap. Bancorp*, 2020

---

[176] Pl.'s Opening Tr. Br. 75; Def.'s Opening Tr. Br. 5–6.

WL 1480857, at \*4 (Del. Ch. Mar. 23, 2020) ("At common law, the law of the forum supplies the limitations period."), *aff'd*, 241 A.3d 221 (Del. 2020).  If the law of two different states may apply to an action, Delaware follows the Restatement (Second) of Conflict of Laws to resolve the conflict, subject to Delaware's borrowing statute. *CHC Invs.*, 2020 WL 1480857, at \*4–5 (citing 10 *Del. C.* § 8121).[177]  In this action, only one state's law applies.  The 2014 Plan and the Awards at issue in this case are all governed by Delaware law and require that any disputes be litigated in the courts in Delaware.[178]  Thus, Delaware law provides the applicable limitations period.  Utah's six-year statute of limitations is inapplicable.

> **b.**     **Section 8106's three-year limitations period, not Section 8111's one-year limitations period, applies to Lundberg's RSU counterclaims.**

Having decided that Delaware law will inform the presumptive limitations period, the court must determine which statute applies.  There are two Delaware

---

[177] Lundberg fails to address the borrowing statute, 10 *Del. C.* § 8121.  Under the borrowing statute, when a case arising factually in a foreign jurisdiction is brought in Delaware, the court will apply the shorter statute of limitations.  The court applies a longer foreign statute of limitations only if the party asserting the otherwise barred claim was forced to litigate that claim in Delaware.  *CHC Invs.*, 2020 WL 1480857, at \*4–8.  A party subject to an enforceable forum selection provision is not forced to litigate the claim in Delaware; instead, the party is deemed to be before this court voluntarily.  *Id.* at \*8.  Lundberg is party to an exclusive Delaware forum provision with respect to his counterclaims.  Not only is that provision enforceable, it has, in fact, been enforced.  Dkts. 47–48.  Therefore, Lundberg is voluntarily before this court and subject to a Delaware statute of limitations. *See CHC Invs.*, 2020 WL 1480857, at \*8.

[178] JX 2 § 3(h).

statutes of limitations that the parties contend apply to Lundberg's RSU counterclaims. Section 8106 of Title 10 of the Delaware Code applies a three-year limit to claims arising from a promise, which includes claims for breach of contract. It states, in pertinent part: "no action based on a promise[ and] no action based on a statute . . . shall be brought after the expiration of 3 years from the accruing of the cause of such action." 10 *Del. C.* § 8106.

Section 8111 of Title 10 imposes a shorter limitations period for claims arising out of work, labor, or personal services. 10 *Del. C.* § 8111. Prior to its amendment in 2023, Section 8111 imposed a one-year limitations period. The 2023 amendment extended the limitations period to two years. If Section 8111 governs this case, the pre-amendment limitations period of one year would apply.[179] The relevant version of Section 8111 stated:

> No action for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed, or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or for any other benefits arising from such work, labor, or personal services performed or in connection with any such action, shall be brought after the expiration of 1 year from the accruing of the cause of action on which such action is based.

---

[179] The amendment, which was enacted during the pendency of this action, only applies to claims that accrued after the amendment took effect on April 26, 2023. 84 Del. Laws 2023, ch. 20, eff. Apr. 26, 2023 ("This Act applies to claims when the date of the accruing of the cause of action on which the action is based is on or after [April 26, 2023]."). All of the claims at issue in this action accrued prior to the amendment, so if Section 8111 is applicable, the one-year limitations period would govern.

In *Goldman v. Braunstein's, Inc.*, 240 A.2d 577 (Del. 1968), the Delaware Supreme Court offered guidance to the trial courts deciding which of the two statutes applies in a particular case. The Court said that Section 8111 applies to claims "arising from services which have been performed," while Section 8106 applies where the "recoverable loss[] arose upon or after termination of the employer-employee relationship." *Goldman*, 240 A.2d at 578.[180]

The *Goldman* standard is easy to articulate, but not always easy to apply. In the more than half century since *Goldman*, courts still acknowledge that the line between Section 8111 and Section 8106 can be a bit fuzzy. *See, e.g.*, *Cochran v. Stifel Fin. Corp.*, 2000 WL 286722, at *5 (Del. Ch. Mar. 8, 2000) [hereinafter "*Cochran I*"] ("Delaware courts have grappled with the overlap between §§ 8106 and 8111 for many years."), *aff'd in part*, *rev'd in part*, 809 A.2d 555 (Del. 2002); *Little Switzerland, Inc. v. Hopper*, 867 A.2d 955, 958 (Del. Ch. 2005) ("[A]lmost every claim for an item specifically mentioned in § 8111 will arise out of a contract generally covered by § 8106."); *Roos v. Del. Valley Radiology, P.A.*, 1989 WL 37157, at *4 (D. Del. Apr. 3, 1989) ("Employment litigation in Delaware often implicates both sections because nearly every claim for wages is based on an

---

[180] The *Goldman* Court was addressing Section 8111's predecessor, Section 8110, which was not materially different from the pertinent version of the statute at issue here. For ease of reference, this opinion will refer only to Section 8111.

underlying promise, express or implied, to pay the wages."); *Turner v. Diamond Shamrock Chems. Co.*, 1987 WL 17175, at \*1–2 (Del. Super. Sept. 14, 1987) (Duffy, J., Retired, sitting by designation) (observing, for example, that "[t]here are two Delaware Statutes of Limitation, each of which, by analogy, may be applied to an ERISA claim[:] first, 10 *Del. C.* § 8111[; and] second, 10 *Del. C.* § 8106"). This court has also explained the difficulty in determining whether to apply Section 8111 or 8106 in specific circumstances.

In 2000, Chief Justice Strine, while a Vice Chancellor on this court, delivered an in-depth analysis of the caselaw addressing Section 8111 and Section 8106 both before and after *Goldman*. *Cochran I*, 2000 WL 286722. The case presented the question of which limitations period applied to a claim for director indemnification. The court identified a tension between *Sorensen v. Overland Corp.*, 142 F. Supp. 354 (D. Del. 1956), *aff'd sub nom. Sorensen v. Overland Corp.*, 242 F.2d 70 (3d Cir. 1957), a pre-*Goldman* decision from the District of Delaware holding that a claim for director indemnification was subject to Section 8111,[181] and *Scharf v. Edgcomb Corp.*, 1997 WL 762656 (Del. Ch. Dec. 4, 1997), which held that Section 8106 governed the limitations period for an indemnification claim. *See Cochran I*, 2000 WL 286722, at \*5–8. *Sorensen* read Section 8111 broadly, opining that "[t]he word

---

[181] As in *Goldman*, the provision at issue in *Sorensen* was the predecessor to Section 8111.

'benefits' is embracing and covers all advantages growing out of the employment." 142 F. Supp. at 360. Noting the compelling arguments in favor of each approach, this court in *Cochran I* erred towards the longer limitations period and applied Section 8106's three-year limitations period. 2000 WL 286722, at *9. On appeal of *Cochran I*, the Delaware Supreme Court was more critical of *Sorensen*, describing our case law as "not approving *Sorensen*" and observing that "[e]ven at the federal level there is some doubt as to *Sorensen*'s viability." *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 558 (Del. 2002) [hereinafter "*Cochran II*"]. The Court found that indemnification, "a right conferred by contract, under statutory auspice," was subject to Section 8106 and left "the *Goldman* dichotomy intact." *Id.* at 559. And, as our Supreme Court explained, its analysis was also "strengthened by the general rule that, if there is doubt as to which of two statutes of limitations applies, that doubt should be resolved in favor of the longer period." *Id.* (citing *Sonne v. Sacks*, 314 A.2d 194, 196 (Del. 1973)).[182]

---

[182] There is a suggestion in *Sorensen* that an employee's claims pertaining to stock options would fall within Section 8111's ambit. *See* 142 F.Supp. at 361 ("Professor Washington contrasts 'direct rewards for services', such as salaries, bonuses and options, with indemnification against litigation expenses as 'another type of reward'." (quoting George T. Washington, Corporate Executives' Compensation 313 (1942)). *Sorensen* did not dilate on this issue as to stock options, and this court did not locate any decisions relying upon *Sorensen* on this issue. In any event, this court must follow *Goldman* and *Cochran II*.

A few years later, *Little Switzerland* presented another Section 8111 and Section 8106 conflict. 867 A.2d 955. In that case, the defendant's employment agreement entitled him to a payment in the event of a change of control. *Id.* at 957. A change of control occurred while the defendant was employed by the corporation, and the corporation made a change of control payment. *Id.* Approximately 18 months later, the defendant disputed the corporation's determination of the amount owed under the contract and sought to arbitrate his claim. The corporation filed suit in this court to enjoin the defendant from pursuing arbitration, arguing that the claim was untimely. *Id.* at 958. Chief Justice Strine, while Vice Chancellor, held that under a "clear" application of the *Goldman* test, Section 8111 applied because "[n]either the obligation of [the corporation] nor the size of that Bonus was contingent on any efforts by [the defendant] after the Change in Control." *Id*. at 959–60.

The court also rejected the employee's attempt to suggest *Cochran II* created a broad exception to the *Goldman* test whenever a plaintiff could conjure a statutory hook to the claim. The court explained:

> In my view, *Cochran* [*II*] must be read as a case dealing with a unique area of employment relationships that is grounded in, and shaped by, statute, and not as a wide exception to *Goldman*. Here, Hopper's right to a Change in Control Bonus is entirely attributable to his having performed work for Little Switzerland up until the moment the Change in Control occurred. His rights do not flow out of any specific provision of our corporate law and the vindication of his interests cannot be said

to serve any larger purpose than is usually, albeit importantly, served by the judicial enforcement of private contracts.

*Id*. at 961. The court's trenchant view that if the "line between § 8106 and § 8111 can never be clearly discerned, a statute has been, by judicial interpretation, repealed," *id.*, is certainly true, and is an outcome to be avoided. *See Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 542 (Del. 2011) ("In our constitutional system, this Court's role is to interpret the statutory language that the General Assembly actually adopts, even if unclear and explain what we ascertain to be the legislative intent without rewriting the statute to fit a particular policy position."); *Leatherbury v. Greenspun*, 939 A.2d 1284, 1293 (Del. 2007) ("Although construing a statute of limitations does not constitute the creation of an exception to the statute in violation of the prohibition against judicial legislation, creating an exception under the guise of 'construction' where a statute is clear and unambiguous is improper." (footnote omitted)). In *Little Switzerland*, *Goldman*'s application produced a clear result. But when faced with a cloudier choice between applying Section 8106 or Section 8111, our Supreme Court in *Cochran II* expressly directed the trial courts to resolve any doubt over which statute applies in favor of Section 8106. 809 A.2d at 559.

Under the *Goldman* test, the court focuses on when the plaintiff's claim arose. The cases illustrate that this is not necessarily when the claim became monetizable, but rather when the underlying source of the right accumulated to the plaintiff. In

60

*Turner*, the Superior Court held that claims for "separation pay allegedly due . . . under an employee welfare benefit plan . . . arise out of work, labor or personal services performed for defendant." 1987 WL 17175, at *2. There, the right was membership in the benefit plan. Although the plan specifically contemplated the delivery of separation pay at the end of the employment relationship, membership in the plan arose and the benefits thereunder accumulated during employment, so the court construed it as one for services performed and applied Section 8111's one-year statute of limitations. *Id.* That the right only matured into one for payment after the employment relationship mattered not—the right belonged to the plaintiffs before termination. By contrast, *Goldman* found that a wrongful termination claim arose "upon or after termination of the employer-employee relationship" and, therefore, fell under Section 8106's three-year statute of limitations. 240 A.2d at 578. There, the plaintiff's alleged harms were fundamentally tied to the employment relationship, but arose from the allegedly wrongful termination itself, which occurred as or after the employment relationship ended. *Id.* Therefore, under the temporal test that the case established, Section 8106 applied. *Id.*

This temporal split becomes more complicated when the arrangement providing for the benefit can potentially give rise to payments both during and after the employment relationship. In that scenario, courts applying these competing statutes have looked to when the conditions precedent to payment were satisfied.

For example, the United States Court of Appeals for the Third Circuit, applying Delaware law, considered which statute applied to a real estate broker's claim for payment of a commission where the broker was employed at the time the sales contract was signed, but the closing of the sale occurred after the broker's employment had ended. *See Lindsey v. M.A. Zeccola & Sons, Inc.*, 26 F.3d 1236, 1244–46 (3d Cir. 1994). The *Lindsey* court reasoned that the claim was subject to Section 8106 because "[i]t was not certain if or when Lindsey would be paid because the [] agreement was contingent," "[h]er right to payment did not accrue until after her employment was terminated," a previous case had applied Section 8106 to an independent broker's commissions and Lindsey's commission was distinguishable from her salary, and because of the Delaware Supreme Court's instruction to "apply the longest statute of limitations in case of doubt." *Id.*

*Weik, Nitsche & Dougherty, LLC v. Pratcher*, 2020 WL 5036096 (Del. Ch. Aug. 26, 2020), presented this court with counterclaims seeking damages for breach of an agreement between a law firm and departed attorneys. The agreement provided for the attorneys to receive contingency fees for legal matters and set additional compensation independent of case outcomes. The court conceptually divided the claims, applying Section 8111 "[t]o the extent any alleged damages are unpaid compensation for services performed" and Section 8106 "to the extent any alleged damages would have been owed to [the lawyers] after [their termination] and

because of a breach of the Succession Agreements." *Id.* at *8. Though the appropriate delineation of the lawyers' claims was unclear and required supplemental briefing after the court's ruling on the limitations defense, the court's ruling clearly split those claims along *Goldman*'s temporal termination line.[183]

Neither the parties in this case nor the court were able to identify a Delaware decision that directly addressed whether Section 8111 or 8106 applies to a former employee's claim for breach of an equity incentive plan or stock option agreement. Both sides identified *Nahill v. Raytheon Co.*, a decision of the Massachusetts Superior Court, which involved application of Delaware law. 2008 WL 4107330 (Mass. Super. July 9, 2008). In *Nahill*, Raytheon Corporation awarded John P. Nahill 5,000 restricted shares. *Id.* at *1. Under the terms of the grant, the shares vested if Nahill remained continuously employed by Raytheon during the vesting period and met certain performance-based goals. *Id.* During the vesting period, Nahill, at Raytheon's request, took a CEO position at Flight Operations, LLC, a joint venture entity of which Raytheon was the majority owner. As a result, Nahill was "an executive caught between two companies" for several months, but remained on Raytheon's payroll. *Id.* at *2. After his award had fully vested, Raytheon moved

---

[183] The parties settled the case before the court issued a final implementing order splitting Defendants' damages line-items between the two statutes of limitations. *Weik, Nitsche & Dougherty, LLC v. Pratcher*, C.A. No. 2018-0803-MTZ (Del. Ch.), Dkts. 147–48.

Nahill to Flight Operations' payroll. *Id.* Months later, Raytheon canceled Nahill's already-vested shares, purportedly because Nahill had not met performance goals, pursuant to a forfeiture term in the governing stock plan. *Id.* at *1–2. More than two years later, Nahill filed suit alleging that the share cancellation breached his employment contract and constituted conversion of the shares. *Id.* Raytheon moved for summary judgment, arguing that both the breach of contract and conversion claims were time-barred under Section 8111. Nahill contended that Section 8106 applied. The *Nahill* court concluded, "in light of the temporal guidance from *Goldman*," that Section 8111 applied to Nahill's claim asserting breach of his employment contract. *Id.* at *5. The *Nahill* court reasoned that "Nahill's right to the value of the 5,000 restricted shares is entirely attributable to his having performed work for Raytheon during the Vesting Period" and "no future work (*i.e.*, beyond June 26, 2003) was contemplated." *Id.* The *Nahill* court concluded, however, that Section 8111 did not apply to Nahill's conversion claim. *Id.* at *5–6.

Solar argues that *Nahill*'s reasoning is applicable here. The court disagrees. First, Nahill's shares had fully vested before Raytheon canceled them and "no future work [] was contemplated" at the time of cancellation. *Id.* Unlike in *Nahill*, the only RSUs at issue in this case were canceled prior to their vesting, and Lundberg's entitlement to each tranche was contingent on his satisfying conditions into the future, after his employment with Solar had ended. *Nahill* fell on one side of

64

*Goldman*'s temporal divide—this case falls on the other.[184]  Second, Nahill's claim

sought a remedy for breach of his employment agreement.  *Nahill*, 2008 WL

4107330, at *1.  Here, Lundberg's employment agreement is not at issue.

Unlike in *Little Switzerland* and *Nahill*, Lundberg did not have a right to the

shares underlying his RSU awards prior to the termination of his employment with

Solar.  His right to vesting of his RSUs required that he continue providing services

to Smart Home—not Solar—after his employment with Solar terminated.

The positions that Solar took earlier in this case also lead to the application of

Section 8106.  In its successful motion for entry of an antisuit injunction against

Lundberg, Solar argued that Lundberg "is not an employee of [Solar] now and is not

claiming his right to the equity awards as a [Solar] employee.  Dispositively, he

could bring the Delaware Claims in the absence of the [Solar] Employment

Agreement."[185]  Solar also argued that Lundberg's counterclaims "do not arise from

---

[184] *Nahill* cited *Cochran II*, but only in passing reference to its factual context, not its legal analysis.  *See Nahill*, 2008 WL 4107330, at *5 ("Delaware courts have applied the three-year statute of limitations in actions arising out of other elements of the employer-employee relationship.  *See, e.g.*, *Goldman v. Braunstein's, Inc.*, 240 A.2d 577 (Del. 1968) (wrongful discharge); *Stifel Financial Corp. v. Cochran*, 809 A.2d 555 (Del. 2002) (indemnification); *Rich v. Zeneca, Inc.*, 845 F.Supp. 162, 166 (D. Del. 1994) (wrongful discharge).").

[185] Dkt. 39 at 22 n.7.  At the time, Solar was seeking to keep the claims under the 2014 Plan in Delaware and to avoid the mandatory arbitration provision in Lundberg's employment agreement, which required arbitration, in Utah and under Utah law, of any claims arising from his employment.  *See* JX 367 §§ 15(a), 16(g), 16(h).

65

or relate to [Lundberg's] employment with [Solar]."[186]   The court relied on those arguments in granting the antisuit injunction.[187]   Therefore, Solar is estopped to argue that Lundberg's claims pertaining to the 2014 Plan and his Awards arise from his employment with Solar.  *See Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008) ("judicial estoppel [] prevents a litigant from advancing an argument that contradicts a position previously taken that the court was persuaded to accept as the basis for its ruling"); *Siegman v. Palomar Med. Techs., Inc.*, 1998 WL 409352, at *3 (Del. Ch. July 13, 1998) ("Judicial estoppel prevents a litigant from advancing an argument that contradicts a position previously taken by that same litigant, and that the Court was persuaded to accept as the basis for its ruling."); *see, e.g.*, *In re Silver Leaf, L.L.C.*, 2004 WL 1517127, at *2 (Del. Ch. June 29, 2004) (finding a party judicially estopped from contesting this court's personal jurisdiction where a party "obtained dismissal of the New Jersey action because he represented that the Delaware Court of Chancery had exclusive jurisdiction"); *see also New Hampshire*

---

[186] Dkt. 39 at 22 n.7; *see also* Dkt. 44 at 17:22–18:5 (Solar's Counsel arguing that the parties "expressly excluded [the RSUs] from the terms and conditions of the employment agreement").

[187] Dkt. 48 at 28:9–17 (The Court:  "The claims arising under the 2014 plan are subject to the forum selection clauses in the 2014 plan and the 2015 and 2016 equity award agreements, rather than the arbitration provision in the employment agreement.  Therefore, Vivint Solar has demonstrated a reasonable probability of success on its claim that Lundberg has breached the equity award agreements by asserting claims arising under the 2014 plan outside of Delaware.").

*v. Maine*, 532 U.S. 742, 743 (2001) ("The purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.").

Solar granted the Awards while Lundberg was an employee of Solar. But, like the real estate agent in *Lindsey*, Lundberg had no right to them at the time, as certain future conditions needed to occur first. Lundberg's right to any given tranche under the Awards only arose if he maintained his status as a Service Provider, *e.g.*, an employee of the Company Group, as of the vesting date for each tranche. All of the tranches at issue here vested while Lundberg was employed by Smart Home. At that point, his employment with Solar had ended, and his right to receive the shares upon vesting was based upon a promise by Solar, not as compensation for work or services performed for Solar.

The court concludes that Section 8106's three-year limitations period applies to Lundberg's RSU counterclaims. Unlike in *Nahill*, Lundberg's canceled RSUs had not vested while he was employed at Solar. Rather, Lundberg's entitlement to those shares arose from services that still needed to be performed—for Smart Home—in order for the RSUs at issue to vest. Thus, his counterclaims arose "upon or after termination of the employer-employee relationship," so "the period of limitations applicable to the present suit is not the one-year provision of [Section 8111], but is the three-year period of [Section] 8106." *Goldman*, 240 A.2d at 578;

67

*accord Cochran I*, 2000 WL 286722, at *6 ("[W]here a plaintiff's claims arise upon or after termination of the employer-employee relationship, then § 8111 is inapplicable and § 8106 applies." (internal quotation marks omitted)). This result also draws support from *Cochran II*, where the Court held that the limitations period in Section 8106 applies to claims for officer or director indemnification. The Court reasoned that the right to indemnification, grounded in Section 145 of the DGCL, was a right "conferred by contract, under statutory auspice" and therefore subject to the three-year limitations period. *Cochran II*, 809 A.2d at 559. Like the statutory source of director and officer indemnification, options and restricted stock units are grounded in statute. *See* 8 *Del. C.* §§ 151–153, 157, 161 (authorizing the issuance of stock and rights to acquire equity in the corporation and to regulate its capital structure).[188] Lundberg's counterclaims allege violation of the 2014 Plan itself, a creature of both statute and contract. Finally, to the extent there is any doubt as to which statute applies, the court is to err on the side of the longer limitations period. *Sonne*, 314 A.2d at 196; *Cochran II*, 809 A.2d at 559. Accordingly, Section 8106 provides the applicable limitations period.

---

[188] *Nahill* did not discuss this reasoning, perhaps because the parties did not address it. Or maybe it was due to the nature of Nahill's breach of contract claim, which appears to have been limited to a claim for breach of his employment agreement, not breach of a separate contract governing an incentive award or an equity incentive plan.

68

c. **Section 8106's three-year statute of limitations bars Lundberg's RSU counterclaims arising before September 29, 2017.**

Having determined the applicable statute of limitations, the court turns next to whether any of Lundberg's counterclaims are time-barred. For statute of limitations purposes, the parties agree that Lundberg asserted his claims on September 29, 2020, the date that he filed the Federal Action.[189] Applying Section 8106's three-year limitations period, any counterclaim that accrued prior to September 29, 2017, is untimely. Solar argues that Lundberg's counterclaims pertaining to three tranches of RSUs under the 2015 RSU Agreement and one tranche under the 2016 RSU Agreement accrued before September 29, 2017, and are time-barred.[190] Thus, absent a meritorious tolling argument, claims as to these tranches are time-barred. Lundberg advances several arguments in favor of the timeliness of these counterclaims. None are successful.

i. **Solar's breaches of the RSU Agreements were segmentable, not continuing.**

Lundberg argues that Solar's cancellation of the Awards and failure to deliver each tranche constitute one continuing breach, such that the statute of limitations

---

[189] Pl.'s Opening Tr. Br. 75; Def.'s Opening Tr. Br. 5–6.
[190] Pl.'s Opening Tr. Br. 75–76.

69

should not begin to run until after Solar failed to deliver the last tranche. Solar argues that its failure to deliver each tranche is a separate, segmentable breach.

"The continuing breach doctrine is narrow and typically is applied only in unusual situations." *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 4440476, at *11 (Del. Ch. Aug. 22, 2016) (internal quotation marks omitted). Continuing breach is an exception to the general rule and arises only when "there is a continuing injury whose damages cannot be determined until the cessation of the wrong." *Branin v. Stein Roe Inv. Couns., LLC*, 2015 WL 4710321, at *7 (Del. Ch. July 31, 2015) (quoting *Oliver B. Cannon & Son, Inc. v. Fid. & Cas. Co. of N.Y.*, 484 F. Supp. 1375, 1390 (D. Del. 1980)). But breach of a recurring obligation does not necessarily give rise to continuing breach. A series of harms only gives rise to continuing harm where "the various acts are 'so inexorably intertwined that there is but one continuing wrong.'" *Lebanon Cnty. Empls.' Ret. Fund v. Collis*, 287 A.3d 1160, 1197 (Del. Ch. 2022) (quoting *Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987)). "[I]f a continuing wrong can be segmented, the applicable statute of limitations will apply to each alleged wrong and not to the course of wrongful conducts as a whole." *Price v. Wilm. Tr. Co.*, 1995 WL 317017, at *3 (Del. Ch. May 19, 1995). In a case for breach of contract, if the aggrieved party "'could have alleged a *prima facie* case for breach of contract . . . after a single incident,'" Delaware courts "have determined that the 'continuing breach' doctrine does not apply even when confronted with

70

'numerous repeated wrongs of similar, if not same, character over an extended period.'" *AM Gen.*, 2016 WL 4440476, at \*12 (alteration in original) (quoting *Price*, 1995 WL 317017, at \*2–3).

Here, Lundberg could have alleged a *prima facie* case for breach of contract as soon as Solar failed to deliver a single tranche.[191] Though future breaches of the same contract were entirely possible, and did in fact occur, nothing about the character of the Awards would prevent the calculation of damages with respect to each independent breach.[192] That Lundberg may have had to file multiple times to

---

[191] As of January 13, 2017, the date on which the first at-issue tranche became due, Solar had a contractual obligation to deliver the shares, breached that obligation, and Lundberg suffered harm from Solar's failure to deliver those shares.

[192] The authorities upon which Lundberg relies are all either distinguishable or, upon inspection, support Solar's position, not Lundberg's. In *Branin*, the plaintiff's indemnification claim did not accrue under the specific terms of the contract until after the underlying litigation ended, which was within the limitations period. 2015 WL 4710321, at \*6. The court noted that the continuing breach doctrine would have applied if the claim had accrued earlier because the defendants' obligation was expanding as the underlying case proceeded and was entirely contingent on the outcome of that other action. *Id.* at \*7. Unlike in *Branin*, Solar's contractual obligation to deliver RSUs, once vested, was set and not contingent on future events.

In *In re ASHINC Corp.*, the "discrete and readily determinable breach" "led to an unforeseeable chain of events [] with serious consequences for the Debtor and damages that could not have been known (or sought) at the time of the breach." 2022 WL 2666888, at \*11 (D. Del. July 11, 2022). Here, Lundberg presents no chain of unforeseeable consequences, and his damages for Solar's failure to deliver shares upon vesting were immediately knowable upon Solar's breach.

In *Matter of Burger*, the alleged breach arose from claims that a farmer failed to meet a service contract's standard of care with respect to a herd of cattle. 125 B.R. 894, 897

(Bankr. D. Del. 1991). The court held that the doctrine of continuing breach applied because, among other reasons, "any claim by the Investors for damages necessarily relies on the liquidation of the herd which, under the terms of the contract, was scheduled to take place on or about September 1, 1988," a date from which the Investors' claim was timely. *Id.* at 902. Therefore, continuing breach applied because the exact amount of their damages was unknowable until the unique asset was sold. Here, the value of each tranche of Lundberg's awards was immediately knowable when owed, and his RSUs were not unique.

*In re Estate of Balk*, 138 A.3d 572 (N.J. Super. Ct. App. Div. 2016), and *Girardot v. Chemours Co.*, 2018 WL 1472337 (Del. Super. Mar. 26, 2018), support Solar's argument, not Lundberg's. Lundberg cited these cases in support of the proposition that "[t]he continuing breach principle is often applied in the context of 'installment' contracts, not unlike the RSU Agreements . . . ."). Def.'s Answering Tr. Br. 71. Neither case, however, stands for that proposition, and the courts in both cases found the claims segmentable, not continuing, under Delaware's definition of "continuing breach." *See Balk*, 138 A.3d at 576–77 (holding that "a new statute of limitations begins to run *against each installment* as that installment falls due and a new cause of action arises from the date each payment is missed" such that an initial breach in 2007, not constituting a total breach, did not render time-barred "payments which were due from the six years prior to the motion's filing date of June 2, 2014" (emphasis added)); *Girardot*, 2018 WL 1472337, at *3 (determining that "the relevant accrual date is 30 days *after each severance payment* was required to be made" (emphasis added)); *see also Worrel v. Farmers Bank of State of Del.*, 430 A.2d 469, 476, 474–76 (Del. 1981) (affirming that "the statute of limitations began to run *with respect to each installment* only from the time it became due, unless the seller had the option of declaring the whole sum due and exercised that option, in which case the statute began to run from the date of the exercise of the option" and holding that the failure to deliver an installment payment outside of the limitations period did not defeat a claim for those moneys when the creditor took action evidencing an election of default within the limitations period (emphasis added)). While *Balk* does refer to such breach as "continuing," a close examination of the decision and of the caselaw on which it relied reveals that the courts of New Jersey refer to the independent accrual of segmentable claims "when the initial[, non-total] breach of a contract occurred outside the statutory period, but successive breaches occurred within it" as "continuing breach." *Nat'l Util. Serv., Inc. v. Cambridge-Lee Indus., Inc.*, 199 F. App'x 139, 142–43 (3d Cir. 2006) (applying New Jersey law, under which claims "could be considered a series of continuing breaches for which plaintiffs could maintain an action for any breach occurring within six years of the filing of the complaint, even if more than six years had elapsed since Newark's initial breach" (internal quotation marks omitted)). Needless to say, another jurisdiction's use of different language does not change the substance of our laws.

pursue damages for breaches in a timely manner is unpersuasive, particularly where, as here, the interpretation of the contract at issue in the first action would effectively decide all subsequent actions arising under the same instrument. Furthermore, mere inconvenience does not result in application of the "narrow" continuing breach doctrine, and cases like this present breaches that "while . . . repetitive, [are] not 'continuing' in the legal sense." *AM Gen.*, 2016 WL 4440476, at \*12–13. The court finds that the doctrine of continuing breach does not apply, and Lundberg's counterclaims with respect to each tranche accrued separately.

### ii. The statute of limitations is not tolled for any of Lundberg's RSU counterclaims.

"The general law in Delaware is that the statute of limitations begins to run, *i.e.*, the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action." *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at \*4 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999). "For breach of contract claims, the wrongful act is the breach, and the cause of action accrues at the time of breach." *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at \*7 (Del. Ch. Jan. 24, 2005).

Lundberg next argues that "his RSU claims did not accrue, or should be tolled, until Solar denied Lundberg's demand for their delivery in August 2020 because

Lundberg was not on notice of the claims."[193]  Lundberg asserts that he was not on notice of Solar's interpretation of the 2014 Plan until he received the letter from Solar's attorneys formally rejecting his demand for his Awards sometime after August 7, 2020.  As the party arguing that a statute of limitations period should be tolled, Lundberg bears the burden of presenting and proving an exception to the general rule of accrual.  *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 504 (Del. 1996).  He has failed to do so.

Lundberg received regular quarterly account statements reflecting his Awards and Award activity under the 2014 Plan from January 2016 to June 2020.[194]  He received those statements "[p]robably within a few weeks" of the end of each quarterly reporting period.[195]  Shares from RSU awards that had vested would be reflected on the statement.[196]  Thus, Lundberg's account statement would reveal to

---

[193] Def.'s Answering Tr. Br. 55 (footnote omitted).

[194] 7/27/21 Lundberg Dep. 129:15–23; *see, e.g.*, JX 377 Ex. GG.

[195] 7/27/21 Lundberg Dep. 129:10–14.

[196] JX 377 Ex. GG at JX377.37 (showing "release" of 1,051 shares on March 6, 2016, and an ending balance of 1,051 shares at the end of the first quarter of 2016); *id.* at JX377.39 (showing "release" of 292 shares on June 6, 2016, and an ending balance of 1,343 shares at the end of the second quarter of 2016).

him within, at most, several weeks after a vesting date whether Solar had delivered—or failed to deliver—shares upon vesting.[197]

Lundberg also had online access to his Morgan Stanley account. Lundberg's testimony that he was unable to log into his Solar Morgan Stanley account until mid-2020 is not credible.[198] Verified records from Morgan Stanley demonstrate eight successful logins to Lundberg's "Vivint Solar/Sunrun" account on six different days during the period in which Lundberg testified he was unable to access that account.[199] Lundberg improperly seeks to place the burden upon Solar, claiming that Solar had not established what he would have seen upon logging into his account. The notion that Lundberg would have logged into his account without

---

[197] *Compare id.* at JX377.37, JX377.39, *with id.* at JX377.41, JX377.43 (stating that there were "No transactions during this period" and identifying ending balances of 1,343 shares for the third and fourth quarters of 2016).

[198] 9/10/21 Lundberg Dep. 56:13–15, 56:25–57:8 ("I remember a couple of times looking -- trying to log into the Morgan Stanley portal to see if there was any information reflected therein. . . . I didn't find any information -- I couldn't log in at the time and -- and there was some -- inability for me to log into the Morgan Stanley portal because Vivint Smart Home also used Morgan Stanley. And so it appeared that -- the confusion I had is that it appeared that -- that my -- that the Morgan Stanley portal access through Vivint Solar no longer existed, and I was only going through my Vivint Smart Home access to a different portal, but it was still a Morgan Stanley product."). This statement's demonstrable noncongruence with documentary evidence leads the court to conclude that Lundberg's deposition testimony on this issue is not credible.

[199] JX 19. This exhibit also shows Lundberg having logged in for two, six-and-a-half, six-and-a-half, one, and four minutes earlier in 2016, prior to his termination. *Id.*

checking his awards strains credulity.[200]  Beyond that, Solar introduced convincing evidence that the Awards—or their absence—would have been displayed in Lundberg's Morgan Stanley account.[201]

Lundberg's 2016 year-end Morgan Stanley account statement reflected 1,343 shares.[202]  On July 6, 2017, Lundberg logged into his Morgan Stanley account for

---

[200] So does Lundberg's contention that he believed that, at some unspecified point in the future, Solar would decide to deliver the tranches it had stopped delivering after he moved to Smart Home.  *See* 7/27/2021 Lundberg Dep. 167:7–21 ("Q:  Where did you expect Vivint Solar to deliver the stock underlining the RSUs granted under Exhibits-3 and 5 if you no longer had a Morgan Stanley account and hadn't opened a Merrill Lynch account?  A:  I believe that when -- at such time as when Vivint Solar determined they were going to be issuing the shares, that they would notify me whether I -- whether I needed to open a Merrill Lynch account or whether I could simply designate a -- a separate account that I was using to have those shares transferred to.  Q:  Did anyone from Vivint Solar tell you that they would be contacting you when they were ready to deliver the shares underlying the RSUs?  A:  I don't recall a specific reference that they would be contacting me.").  Nor is Lundberg's contention that the switch to Merrill Lynch explained Solar's failure to deliver his RSUs any more persuasive.  *Compare* JX377 at JX377.41, JX377.43 (stating that there were "No transactions during this period" for the third and fourth quarters of 2016), *with* Black Dep. 47:10–17 and Black Decl. ¶ 28 (explaining that Solar did not switch to Merrill Lynch until mid-2017).

[201] JX 17 at SOLAR000396 (presenting the landing page, which clearly displayed awarded, vested, and unvested awards, in an email explaining to award recipients how to accept their awards); JX 18 at SOLAR001249 (presenting enlarged visuals from a draft of the final email); *cf.* 7/27/2021 Lundberg Dep. 183:1–8 (stating, when asked about JX 17, that "I don't recall ever seeing that information on that portal.  Doesn't mean it wasn't there.  I was -- I was always more -- more -- I always emphasized the hard copy more so than the electronic version.  That's why I would send myself copies of those types of email so I could print them and have a hard copy of them.  I don't recall the specific information that is reflected in this being available to me on the portal."); *id.* at 184:16–17 ("I am not here saying that it wasn't there.  I don't recall ever having seen it there.").

[202] JX 9.

18 minutes[203] and effectuated the sale of his entire position of 1,343 shares, leaving a zero share balance.[204] Thus, Lundberg knew no later than July 6, 2017, and likely much earlier, that Solar had not delivered the RSUs that became due more than three years before he filed the Federal Action.[205] Indeed, Lundberg testified that the Morgan Stanley portal reflected RSUs if they had vested.[206]

The 2014 Plan states that the Award agreements will state the time after which RSUs must be delivered,[207] and the RSU Agreements required delivery of each tranche within 60 days of vesting.[208] As to each tranche of shares, Lundberg's claims

---

[203] JX 19. This exhibit also shows a second, one-minute login several hours later on July 6, 2017. *Id.*

[204] JX 15.

[205] The delivery period for two of those tranches had already expired months earlier by this time, and only a week remained for the expiration of that period with respect to the next two tranches. Lundberg's decision to sell out at this point underscores the logical inference that he did not expect further shares to be delivered, and his deposition testimony confirms that he understood that he was selling his entire investment. *See* 7/27/2021 Lundberg Dep. 166:11–22 ("Q: And why did you decide to sell the shares? A: I decided to sell the shares because I was no longer a -- well, I -- I felt like that I could legally do so because I felt like I no longer was privy to inside information and so that I could sell them. And I also wanted to close out that account. Q: And when you say 'close out that account,' what do you mean? A: I -- I understood I wouldn't be utilizing that account anymore and so I wanted to -- I wanted to close out the use of the Morgan Stanley account and the shares that were in that.").

[206] 9/10/21 Lundberg Dep. 60:3–4.

[207] JX 2 § 6(d).

[208] "[V]ested Restricted Stock Units will be paid in whole Shares as soon as practicable after vesting, but in each such case within the period 60 days following the vesting date." JX 3 Ex. A ¶ 2; JX 5 Ex. A ¶ 2 (same).

accrued no later than 60 days after the vesting date, when that tranche was due.[209]

Therefore, the court must look next to that series of breaches to determine the appropriate time or times from which the statute of limitations runs.

### iii. Lundberg's counterclaims for the four RSU tranches due before September 29, 2017, are time-barred.

Section 8106's three-year statute of limitations bars Lundberg's counterclaims for damages for Solar's failure to deliver three tranches of the 2015 RSU award, which became due on January 13, 2017, April 15, 2017, and July 13, 2017, and the first tranche of the 2016 RSU award, which became due on July 14,

---

[209] Lundberg had previously raised in his briefing on the motion for judgment on the pleadings an alternative theory that he did not pursue at trial. *See* PTO ¶ 25 (stipulating that "Solar and Lundberg respectfully refer to their respective Trial Briefs for their statements of the issues of fact they intend to establish at trial *and statements of legal issues to be tried*." (emphasis added)); *Emerald I*, 726 A.2d at 1224 ("Issues not briefed are deemed waived."). Even if it had been presented, it fails. Lundberg contended that Solar had discretion to delay delivery of the RSUs indefinitely, so the breach did not occur until he received the letter from Solar's counsel in August 2020 that rejected his request for delivery of his awards. The 2014 Plan stated that "Payment of earned Restricted Stock Units will be made when practicable after the date set forth in the Award Agreement and determined by the Administrator." JX § 6(d). Lundberg's 2015 and 2016 RSU Agreements stated that "vested Restricted Stock Units will be paid in whole Shares as soon as practicable after vesting, but in each such case within the period 60 days [sic] following the vesting date." JX 3 Ex. A ¶ 2; JX 5 Ex. A ¶ 2. Lundberg's argument that Solar had full discretion to delay the awards indefinitely ignores the requirement in the 2014 Plan and the award agreements that the RSUs be delivered when practicable, and Lundberg presents no argument that Solar was unable to deliver his RSUs for any reason. Solar's breach occurred upon its failure to deliver each tranche within 60 days of the vesting date, as outlined in each award agreement. Although the 2014 Plan states it controls in the event of any conflict between it and an award agreement, there is no conflict concerning the required time for payment of underlying stock pursuant to the awards.

2017. Solar is entitled to declaratory judgment under its second count that Lundberg's claim as to these four tranches is time-barred. The remainder of Lundberg's counterclaims arising from the Awards, altogether eight tranches of the 2015 RSU award, the second tranche of the 2016 RSU award, and the entire 2015 stock option award, are not time-barred.

### 4. Damages

The general measure of damages for breach of contract is based on the injured party's expectation interest. *Duncan v. Theratx*, 775 A.2d 1019, 1022 (Del. 2001) (citing Restatement (Second) of Contracts § 347 cmt. a (1981)).

> When determining expectation damages, courts determine an amount that will give the injured party the benefit of its bargain by putting that party in the position it would have been but for the breach. The primary element of expectation damages is the [] value that the performance would have had to the injured party, or the loss in value caused by the deficient performance compared to what had been expected.

*Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 695 (Del. 2019) (internal quotation marks and footnote omitted).

### a. The RSU Agreements

Lundberg's damages are not confined to the monetary value of the Solar shares on the date that Solar was required to deliver them under the terms of the RSU Award agreements. Lundberg's damages must also account for the resulting restraint of Lundberg's elective action in choosing when to sell the shares. *See Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992) ("The injury

that the plaintiff suffers is the deprivation of his range of elective action, and by applying the conversion measure of damages a court endeavors to restore that range of elective action."), *aff'd*, 620 A.2d 856 (Del. 1992). The parties acknowledge that a damages award equal to the face value of the awards on the date of breach does not, necessarily, make Lundberg whole.[210]

Lundberg is entitled to damages based upon the highest market price of the Solar shares reached within a reasonable time of Lundberg's discovery of the breach. *Am. Gen.*, 622 A.2d at 8; *Haft v. Dart Gp. Corp.*, 877 F.Supp. 896, 902 (D. Del. 1995); *Segovia v. Equities First Hldgs., LLC*, 2008 WL 2251218, at *21 (Del. Super. May 30, 2008).[211] The parties agree on the appropriate framework but disagree as to its application. Specifically, they dispute the appropriate beginning and ending dates of the "reasonable time" in which these damages should be measured.[212]

---

[210] Pl.'s Answering Tr. Br. 68; Def.'s Answering Tr. Br. 74; Pl.'s Post Tr. Br. ¶ 127.

[211] "The intuition behind this rule is that the issuer-defendant should bear the risk of uncertainty in the share price because the 'defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable.'" *Duncan*, 775 A.2d at 1023 (quoting *Am. Gen.*, 622 A.2d at 10). This approach also recognizes that "the issuer should not bear the risk of *all* subsequent share price increases because it is impossible to know whether and when the stockholders actually would have sold their shares during the restricted period." *Id.* at 1023–24 (emphasis added). The reasonable time framework, therefore, strikes a balance between placing the risk of uncertainty on the party in the wrong and avoiding speculative damages awards.

[212] *See, e.g.*, Pl.'s Answering Tr. Br. 69, 74; Def.'s Post Tr. Proposed Findings of Fact 10–11, 15, 17–21.

Each side presented damages experts who calculated Lundberg's potential recovery.    Solar's expert, Timothy J. Meinhart, of Willamette Management Associates, presented damages calculations under four "reasonable time" scenarios.[213]    The start date under each scenario was determined by Solar's counsel.[214]   For the end date of each period, Meinhart selected the date by which Lundberg could have sold the shares without depressing the market price of Solar's

---

[213] *See generally* JX 318.

[214] *Id.* ¶ 2 ("In this report, I set forth my analysis and opinions estimating potential damages, assuming that Lundberg has met his burden of establishing liability and entitlement to the equity awards, under four different damage scenarios with specific assumptions provided by Vivint Solar's legal counsel.").  In Scenario 1, Meinhart assumed that (a) Lundberg was entitled to damages only for those RSU tranches which vested prior to July 15, 2017 ("the date Lundberg allegedly stopped working as a consultant for Vivint Solar"), and (b) Lundberg learned of the breaches of the RSU Agreements on September 13, 2017, marking the start of the "reasonable time" period for calculating his damages for all vested RSUs. *Id.* ¶¶ 36, 37–38.

In Scenario 2, Meinhart assumed that (a) Lundberg was entitled to damages for all of the RSU Awards, and (b) the start date for the "reasonable time" period was July 14, 2018, for awards under the 2016 RSU Agreement and July 13, 2019, for awards under the 2015 RSU Agreement, the dates upon which the final tranche of shares was to have been delivered under each agreement.  *Id.* ¶¶ 41–42.

In Scenario 3, Meinhart assumed that (a) Lundberg was entitled to shares under all of the RSU Awards and (b) the "reasonable time" for all of the RSU Awards should be calculated from August 6, 2020, the date of Solar's counsel's letter to Lundberg informing him that his awards had been canceled upon his termination from Solar.  *Id.* ¶¶ 45–46.

In Scenario 4, Meinhart assumed that (a) Lundberg was entitled to all of shares underlying the RSU Awards, and (b) the "reasonable time" should be calculated from August 21, 2016, when Solar canceled Lundberg's unvested tranches under the RSU awards. *Id.* ¶¶ 49–50.

stock.[215]  Meinhart referred to this as the "dribble-out period."[216] For each scenario,

Meinhart applied the Amihud Measure to determine the effect of these hypothetical

sales on the market price for Solar's shares and calculated the dribble-out period for

each block, resulting in periods of "reasonable time" ranging from one to nine

days.[217]  Meinhart's calculations resulted in potential RSU damages of $206,028,

$518,930, $2,536,731, and $306,287 in the four scenarios Solar submitted to him for

analysis.[218]

Lundberg contends that a 60-day "reasonable time" period is appropriate

because of the time it would have taken him to consider the transaction.[219]  The

damages calculation by Lundberg's expert, Richard S. Hoffman, of Loan Peak

---

[215] *Id.* ¶¶ 31–33, 52, 57–60.

[216] *Id.* ¶ 52.

[217] The Amihud Measure, developed by Professor Yakov Amihud, estimates the price impact of changes in historic trading volume. *Id.* ¶ 54.  Meinhart used the Amihud Measure to calculate how many shares could be sold into the market without affecting the trading price. *Id.* ¶¶ 54–60 (explaining Meinhart's application of the Amihud Measure); *id.* Ex. 1 (presenting a summary of and conclusions from Meinhart's calculations); *id.* Ex. 2 (same).

[218] *Id.* ¶ 5.

[219] "Lundberg's damage expert has used a reasonable period of 60 days following the first date by which Lundberg could have sold his converted stock for Lundberg to assess the market and the tax consequences of any sale, the reasonable value of his shares, speculate on obtaining a return in the marketplace, and sell his shares over a period of time that would not depress the market." Def.'s Opening Tr. Br. 77 (footnote omitted).  Lundberg cited *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1 (Del. Ch. 2003), in support of his application of this period. *Comrie* did not, however, consider any of these factors. Rather, its 90-day "period of time comes from the fact that, upon termination, the BIT Group had 90 days to exercise all vested options." *Id.* at *20.

Valuation Group, was more straightforward than Meinhart's. Hoffman calculated damages based on the highest intermediate share price within two alternative 60-day periods. The first period started on December 15, 2020, and the second started on January 1, 2021.[220]

Hoffman selected each time period based upon Lundberg's declaration as to when he could and would have sold his shares after learning of Solar's breach.[221] Lundberg asserts that he was not on notice of Solar's breach until August 2020, after receiving a response letter from Solar's counsel informing him that all of his unvested awards had been canceled upon his termination of employment from Solar in 2016.[222] When he received the letter in August 2020, the Solar-Sunrun merger had been publicly disclosed, but the transaction had not yet closed. Lundberg asserts that he could not have sold his shares in August 2020 because he possessed material non-public information about disputes between Solar and Smart Home that arose after the announcement of the Solar-Sunrun merger.[223] According to Lundberg,

---

[220] JX 351 at JX351.9.

[221] *Id.* at JX351.8, JX351.8–9 (explaining that "consistent with what [Hoffman] underst[oo]d Mr. Lundberg will testify to, [Hoffman] measured damages assuming Mr. Lundberg would have sold his shares in the sixty days following when he first could possibly have done so (mid-December 2020)" and "the period he declared he likely would have been willing to do so (January and February 2021)" and calculating damages accordingly).

[222] JX 77 ¶ 1 [hereinafter "Lundberg Decl."].

[223] *Id.* ¶ 2.

those issues were resolved in November 2020.[224] But even then, Lundberg maintains that his first reasonable opportunity to sell the shares would not have been until January 2021 "because of the tax advantage of selling in a later tax year, [and] because selling in December 2020 presented a reduced but nonetheless significant risk that [Lundberg] would be selling with knowledge of current material non-public information."[225]

The Solar-Sunrun merger closed on October 8, 2020. In the merger, each share of Solar stock was converted into 0.55 shares of Sunrun stock.[226] Hoffman calculated damages for Lundberg's RSU Awards based upon the number of Sunrun shares that Lundberg would have received in the merger and the trading price of

---

[224] *Id.* ¶ 5.

[225] *Id.* ¶¶ 5–6. Lundberg did not enter any evidence to this effect beyond his six-paragraph declaration. Solar submitted a competing declaration from Black, who asserted that this information was not material. Black Decl. ¶¶ 71–74. The burden of establishing a longer "reasonable time" is on the party seeking damages to establish a longer period. *Wyndham, Inc. v. Wilm. Tr. Co.*, 59 A.2d 456, 460 (Del. Super. 1948) ("Plaintiff has not shown that a period so long as to include March 25 was reasonably required . . . ."). The court finds that Lundberg has not met his burden with respect to his assertion that he was in possession of material non-public information. Lundberg has proffered only his six-page declaration in support of his assertion that he was in possession of material non-public information. This is weak evidence. And even weighing Lundberg's declaration against Black's declaration, the court does not find reason to weigh Lundberg's more heavily—rather, having already determined that Lundberg's deposition testimony regarding his lack of access to his Morgan Stanley account lacked credibility, the court is inclined to place more weight on Black's declaration than Lundberg's. Lundberg's assertions regarding his preference for favorable tax treatment rely upon his inability to sell until at least November 2020, which the court finds to be counterfactual, and, therefore, beside the point.

[226] JX 351 at JX351.9.

those shares during Hoffman's two measurement periods.[227]  Hoffman determined that the highest intermediate price of Sunrun stock during both measurement periods occurred on January 12, 2021, the date on which Sunrun's stock reached $100.93.[228] Hoffman calculated Lundberg's damages for all of the Awards at issue in this case to be $5,663,538.[229]

The parties did not take issue with either expert's calculations,[230] sparring instead over the assumptions upon which they directed their experts to rely.  But neither side's assumptions regarding the date on which to begin the "reasonable time" were correct.  As discussed earlier, Lundberg knew of Solar's breaches with respect to the RSU Awards no later than 60 days after the vesting date for each tranche, which is the date upon which Solar was required to deliver the shares.[231] Therefore, the court rejects Lundberg's assertion that he was not aware of the breach until after receiving the letter from Solar's counsel in August 2020.  The court

---

[227] *Id.*

[228] *Id.*

[229] *Id.*  Unlike Meinhart, Hoffman did not provide separate calculations for the RSU Awards and the options.  Replicating Hoffman's calculations with just the RSU Awards yields damages of $5,347,866.89.

[230] Hoffman specifically noted that he "duplicated [Meinhart's] calculations and found no mathematical errors," "the share prices, volumes traded, and range in share price was accurate for the time period over which [Meinhart] gathered the data from August 2016 through October 2020," and "for ease of comparability, [Hoffman] estimated damages using as much of the model Mr. Meinhart created as is practical."  *Id.* at JX351.4.

[231] *See supra* § II(A)(3)(c)(ii).

declines to accept the assumptions upon which the parties directed their experts to rely and, instead, proceeds with its own calculation of Lundberg's damages.

### ii. The court's calculation of damages for the RSU Agreements

"What constitutes a reasonable period of time is a question of law for the court to determine." *Segovia*, 2008 WL 2251218, at *21. Lundberg advocates for a 60-day period. Solar argues that 60 days is not reasonable, pointing to the statement in *Duncan* that the "'reasonable time' in this context is the 'time in which [the plaintiff] could have disposed of its shares without depressing the market had it been able to do so.'" 775 A.2d at 1023 n.9 (alteration in original) (quoting *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 609 (S.D.N.Y. 1977)). The *Duncan* Court reframed this period, observing that "[a]lternatively, one may think of this period as the time required for the stockholders to determine whether they wish to sell their shares immediately after the restrictions are lifted or to retain them for speculative purposes." *Id.* at 1024 n.14.

Our courts have pursued a context-specific approach to determining the reasonable time period rather than focusing solely upon on when a non-breaching party could have disposed of its shares in the open market without the market price. *See, e.g.*, *Am. Gen.*, 622 A.2d at 13 (considering, in determining the "'reasonable time,'" that American General knew in advance that it would be harmed, "would have been prepared to proceed to replace its shares immediately thereafter if it had

86

desired to do so," and had the "resources and financial means" to have acted quickly); *Comrie*, 837 A.2d at 20 (finding that "the 'reasonable period' for determining the 'highest intermediate value' . . . is 90 days from the date of vesting. This period of time comes from the fact that, upon termination, the BIT Group had 90 days to exercise all vested options."); *Segovia*, 2008 WL 2251218, at *2, *22 (deciding, without further discussion, that the period from the conversion of shares in "February and March of 2006" until May 31, 2006, was a "reasonable time" from which to determine the highest intermediate value). "Two or three months has been accepted as a reasonable period of time to replace an asset on the open market." *Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 308 (Del. Super. 2022) (setting a three-month "reasonable time" for replacement of cryptocurrency tokens and relying on *Segovia*, *Comrie*, and *Gallagher v. Jones*, 129 U.S. 193 (1889), where the U.S. Supreme Court affirmed the application of a two-month reasonable period).

The court concludes that, based on the specific facts of this case, a 90-day period from the date by which Solar was required to deliver each tranche of shares is a "reasonable time" for the calculation of Lundberg's damages.[232] *See Duncan*, 775 A.2d at 1023 n.10 ("the court should apply a compromise attempt to value the

---

[232] Solar was not contractually required to deliver the underlying shares until 60 days after vesting. Thus, Lundberg was not improperly restrained from trading the shares until after that date.

chance that the plaintiff might at some time have profited by a rise in value" (internal quotation marks omitted)). This period is also in accord with those employed in *Comrie*, *Segovia*, and *Diamond Fortress*. Based on this conclusion, the court calculates Lundberg's damages under the RSU Agreements as follows:

| Breach Date | End of the "Reasonable Time" | Highest Intermediate Value[233] | RSUs | Sale Proceeds |
|---|---|---|---|---|
| 10/13/2017 | 1/11/2018 | $4.28 | 447 | $1,913.16 |
| 1/13/2018 | 4/13/2018 | $4.25 | 447 | $1,899.75 |
| 4/15/2018 | 7/14/2018 | $5.80 | 447 | $2,592.60 |
| 7/13/2018 | 10/11/2018 | $6.15 | 447 | $2,749.05 |
| 7/14/2018 | 10/12/2018 | $6.15 | 44,353 | $272,770.95 |
| 10/13/2018 | 1/11/2019 | $7.44 | 447 | $3,325.68 |
| 1/13/2019 | 4/13/2019 | $5.65 | 447 | $2,525.55 |
| 4/15/2019 | 7/14/2019 | $8.40 | 447 | $3,754.80 |
| 7/13/2019 | 10/11/2019 | $9.82 | 447 | $4,389.54 |

Therefore, Lundberg is entitled to a total base damages award of $295,921.08 from the RSUs.

### b. The 2015 Option Agreement

Next, the court turns to Lundberg's options under the 2015 Option Agreement. For those options that had already vested, the date of breach was November 21, 2016,

---

[233] Values used herein are the highest trading price per day, as taken from Meinhart's report. JX 318 Ex. 15; *see* JX 351 at JX351.4 (stating that Hoffman agreed that these "share prices, volumes traded, and range[s] in share price [were] accurate").

when Solar canceled them.[234]  For the remaining eleven tranches, the date of breach

was the date of vesting, when they should have become exercisable under the terms

of the 2015 Option Agreement.  As with Lundberg's RSU Awards, the court

concludes that Lundberg knew of the breaches at or shortly after the vesting dates

for each tranche.[235]

The exercise price of each of these options, $14.15,[236] far exceeded the value

of Solar's stock until more than a year after the final tranche became exercisable.[237]

Therefore, using the same reasonable time period methodology employed in

---

[234] *See* JX 88 at JX88.1 (demonstrating that, after Solar removed Lundberg from its Workday, Morgan Stanley set Lundberg's options under the 2015 Option Agreement to be canceled on November 21, 2016).

[235] As with the RSU Awards, Lundberg's unsupported testimony on this point is outweighed by the weight of the otherwise uncontested documentary evidence.  *See* JX 17 at SOLAR000396 (presenting the landing page, which clearly displayed awarded, vested, and unvested awards—including options—in an email explaining to award recipients how to accept their awards); JX 18 at SOLAR001249 (presenting enlarged visuals from a draft of the final email); JX 19 (demonstrating Lundberg logging into his Morgan Stanley account multiple times after leaving Solar); *cf.* 7/27/2021 Lundberg Dep. 233:23–234:2 ("Q:  Was there any indication on your Morgan Stanley account that you could access through your portal that those -- any of the stock options awards had vested by the time you left Vivint Solar?  A:  Not to my -- not in my recollection."); 9/10/21 Lundberg Dep. 56:13–15, 56:25–57:2 ("I remember a couple of times looking -- trying to log into the Morgan Stanley portal to see if there was any information reflected therein. . . .  I didn't find any information -- I couldn't log in at the time and -- and there was some -- inability for me to log into the Morgan Stanley portal . . . ."); *see generally supra* § II(A)(3)(c)(ii).

[236] JX 318 ¶ 22; JX 351 at JX351.6.

[237] Solar's stock price hit a daily high over $14.15 per share for the first time after all of Solar's breaches on July 7, 2020, when the share price peaked at $15.10 per share.  *See generally* JX 318 Ex. 15.

89

measuring damages for the RSU Agreements (90 days from breach), the "in the money" or "intrinsic" value of each tranche was $0.[238]

Hoffman, Lundberg's expert, correctly notes that even "stock options that are 'out of the money' do have value."[239] *See Palkon v. Maffei*, 311 A.3d 255, 273 (Del. Ch. 2024) (observing that an out of the money call option "has value because there are future states of the world in which the stock price exceeds the strike price"). Indeed, Hoffman identifies methods by which the options could be valued.[240] He does not, however, attempt to value these options while they were out of the money. Instead, he argues that "it is less likely that a person would sell their 'out of the money options' than it is to assume they would simply continue holding on to them hoping for the options to one day be in the money."[241] Hoffman then repeated Lundberg's contentions as to why, if Lundberg had held onto the options, he would not have sold the shares until a time period in which his recovery would, incidentally, be maximized.[242]

---

[238] *See Comrie*, 837 A.2d at 5 n.7 ("The 'in the money' or 'intrinsic' value of a stock option, as used in this litigation, is the difference between the exercise price of an option and the fair market value of the underlying stock.").

[239] JX 351 at JX351.6.

[240] *Id.* at JX351.6 n.8 (listing "the Lattice approach, Black-Scholes, Monte Carlo approach, etc.").

[241] *Id.* at JX351.6.

[242] *Id.* at JX351.8 (relying on Lundberg Decl.).

These arguments miss the point. Lundberg's position that he might have held the options until they were in the money, rather than acquiring a constructive replacement at the time of breach, is not unreasonable, but an award of damages based on that hypothetical is not the court's understanding of what the law requires. A plaintiff may not "pick and choose, with hindsight, a single date to set that value. Rather, the date should be established by resort to a 'constructive replacement' purchase by the plaintiff, *i.e.*, how long it would have taken the plaintiff to replace the securities on the open market." *Am. Gen.*, 622 A.2d at 13.[243] The court must, therefore, look at what the cost of acquiring a "constructive replacement" for these significantly out of the money options would have been. Hoffman asserts that their value is non-zero, but he does not attempt to assign an actual monetary value to any of the options during the period in which they were out of the money.[244]

---

[243] Following this approach allows for consistency of outcomes without the intrusion of hindsight and, in some circumstances, could result in higher damages than would have resulted from waiting for the options to be in the money. For example, had Solar gone bankrupt or been acquired for cash at a low price per share, these options never would have been in the money, and Lundberg's damages from the options could have been maximized by receiving the value of a constructive replacement within 90 days of vesting rather than by waiting for them to be in the money.

[244] It is apparent that Lundberg did not want his expert to value his options using the traditional valuation methods for periods in which they were out of the money. Rather, Lundberg made the tactical decision to seek the maximum damages possible by relying not only on a run up in the price of Solar stock after announcement of the Sunrun merger, but also on a post-merger Sunrun price during the most advantageous period available. The court rejects that gambit.

There is, therefore, no evidence in the record on what the actual value of these underwater options would have been at the times at which the court must measure damages other than that it is non-zero.[245] Absent evidence of what that value would *actually* be, any non-zero compensatory damages award would be speculation by the court. "This Court simply cannot credit [Lundberg] with market prescience. And, as the United States Supreme Court has observed, even where the defendant by his own wrong has prevented a more precise computation, the factfinder may not render a verdict with respect to damages based on speculation or guesswork." *Duncan*, 775 A.2d at 1024 n.12 (cleaned up) (internal quotation marks omitted). "The burden is upon [Lundberg] to furnish such proof. If he fails in this respect, the [factfinder] cannot supply the omission by speculation or conjecture." *Laskowski v. Wallis*, 205 A.2d 825, 826 (Del. 1964) (internal quotation marks omitted).

---

[245] Meinhart assigned a $0 value to the options during the periods in which they were underwater, but was instructed to assume that each option needed to be exercised within 90 days of vesting and was asked only to calculate net proceeds, not the options' value, so his report is of no probative value on this point either. JX 318 at JX318.13 n.34 (disclosing that "[w]ithin all the scenarios discussed in [his] report, [Meinhart] was asked by legal counsel to assume the Vivint Solar stock options would expire as worthless unless exercised within 90 days of a triggering event"); Meinhart Dep. 48:3–8 ("In terms of the 90-day period, it really didn't come into play directly in what I'm doing with that particular calculation I just described. It certainly would come into play with a valuation of the option itself, but not necessarily the net proceeds that I was estimating in my damages calculation."). As explained earlier in this opinion, that assumption was incorrect, because the deadline to exercise within 90 days only arose if Lundberg were no longer a Service Provider under the 2014 Plan. Lundberg was, at all relevant times, a Service Provider under the 2014 Plan. *See supra* § II(A)(2)(b).

Nevertheless, "[e]ven if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages." *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009); *see* Restatement (Second) of Contracts § 346(2) (1981) ("If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages."). "Nominal damages are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong." *Ivize of Milwaukee*, 2009 WL 1111179, at *12 (internal quotation marks omitted). Therefore, in recognition of Lundberg's rights and Solar's wrongs, the court awards nominal damages of $1 for each of Solar's breaches under the 2015 Option Agreement. In total, the court concludes that the appropriate award of damages for Solar's breach of the 2015 Option Agreement is $12.[246]

### 5. Pre- and post-judgment interest

"In Delaware, prejudgment interest is awarded as a matter of right. Such interest is to be computed from the date payment is due." *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) (citation omitted). Where damages do not

---

[246] This is derived from Solar's cancellation of Lundberg's options that had vested prior to his move to Smart Home and Solar's failure to deliver each of the 11 remaining tranches.

accrue immediately upon breach, prejudgment interest is measured from the date on which the damages began to accrue. *Am. Gen.*, 622 A.2d at 13–14 (holding that "[t]he date of the breach[] is not the appropriate starting point for the computation of interest" and instead the appropriate date from which to measure prejudgment interest is "the date on which [] damages began to accrue").

In addition to the base damages for each RSU tranche that is not time-barred, Lundberg is entitled to prejudgment interest at the legal rate, calculated with respect to each tranche from the date such tranche became due. 6 *Del. C.* § 2301; *Am. Gen.*, 622 A.2d at 13–14. This interest shall be compounded. *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 173 (Del. 2002) (holding that the Court of Chancery has discretion to award compound interest); *Brown v. Ct. Sq. Cap. Mgmt., L.P.*, 2024 WL 1655418, at *3 (Del. Ch. Apr. 17, 2024) ("[F]or the last few decades, the Court of Chancery has awarded compound interest as a matter of practice."). The court also has discretion to select the compounding interval. *Brown*, 2024 WL 1655418, at *5. Interest shall be compounded quarterly. *See id.* (ordering interest to be compounded quarterly); *Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *24 (Del. Ch. Sept. 19, 2022) ("When the Court awards the legal rate of interest, the appropriate compounding rate is quarterly." (cleaned up) (internal quotation marks omitted)).

Prejudgement interest is not, however, warranted with respect to the nominal damages arising from Solar's breach of the 2015 Option Agreement. The court awards nominal damages "merely in recognition of a technical injury and by way of declaring the rights of [Lundberg]." *Ivize of Milwaukee*, 2009 WL 1111179, at \*12 (internal quotation marks omitted). Because this award of nominal damages is "merely symbolic," an award of prejudgment interest is not warranted. *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 7704774, at \*10 (Del. Ch. Nov. 15, 2023) (observing that "the compensatory and disgorgement purposes of prejudgment interest arise from the premise that the damages award was 'plaintiff's money'— money that the plaintiff would have had in her possession absent wrongdoing" are "not served if nominal damages are merely symbolic").

Post-judgment interest is also awarded as a matter of right. *See Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 978 (Del. 2021) (citing 6 *Del. C.* § 2301(a)). Lundberg is awarded post-judgment interest at the legal rate on the combined amount of the damages award and prejudgment interest. *See NGL Energy P'rs LP v. LCT Cap., LLC*, No. 265, 2023, slip op. at 2 (Del. May 28, 2024) ("Prejudgment interest is part of the 'judgment' and, as such, should be included in the amount on which post-judgment interest accrues."). Post-judgment interest shall be compounded quarterly.

**B. Finding Breach, the Court Need Not Reach Lundberg's Implied Covenant Counterclaims.**

Having granted Lundberg's requested relief under his contractual theories, the duplicative implied covenant counterclaims are moot, and the court need not reach them. *See Wilm. Savs. Fund Soc'y, FSB v. Foresight Energy LLC*, 2015 WL 7889552, at \*10 (Del. Ch. Dec. 4, 2015) ("The Trustee is entitled to relief under the express language of the Indenture, rendering it unnecessary to consider implied obligations. [The implied covenant Count] is moot.").

**C. No Further Remedy Stems from the Forum Selection Clause.**

At the beginning of this case, Solar sought, and obtained, a preliminary anti-suit injunction preventing Lundberg from litigating his claims regarding the Awards in Utah. Now, at the close of the case resolving those claims, Solar seeks an award of fees it incurred enforcing the forum selection clause and a permanent injunction enforcing the forum selection clause against Lundberg with respect to the Awards. Neither is warranted.

**1. Solar is not entitled to damages for the fees it incurred enforcing the forum selection clause.**

Solar argues that it is entitled to recover damages compensating it for the fees it incurred in enforcing the forum selection clause, asserting that it is "entitled to recover from Lundberg the damages it suffered as the result of Lundberg's wrongful

conduct."[247]  The "wrongful conduct" of which Solar complains was Lundberg's filing of these claims outside of Delaware in violation of the forum selection clause. To remedy this conduct, Solar sought and received the remedy our law provides—specific performance of the forum selection clause.  Solar now seeks its costs as the prevailing party with respect to the preliminary injunction.

"Delaware follows the 'American Rule,' whereby a prevailing party is generally expected to pay its own attorney's fees and costs." *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).  "The American Rule has two general categories of exceptions:  fee-shifting statutes and equitable doctrines." *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996) (footnote omitted).  Solar does not, however, articulate what exception to the American Rule it relies on in seeking its fees, arguing only that "'an award of such damages does not contravene the American Rule.'"[248]  It does.

Solar's sole citation supporting its single-paragraph argument that it is entitled to fees is to *O'Steen*, which denied a motion to dismiss a claim seeking damages for breach of a forum selection agreement.  2006 WL 2788414.  There, John O'Steen, the defendant in the Delaware action, filed a separate action in Ohio approximately

---

[247] Pl.'s Opening Tr. Br. 78.

[248] *Id.* at 78–79 (quoting *Cornerstone Brands, Inc. v. O'Steen*, 2006 WL 2788414, at *4 (Del. Ch. Sept. 20, 2006) [hereinafter "*O'Steen*"]).

one month after Cornerstone Brands, Inc. ("Cornerstone"), the Delaware plaintiff, initiated the case in this court.[249] Cornerstone raised the forum selection clause as a defense in Ohio and prevailed on a motion to stay that action, which was subsequently dismissed without prejudice.[250] A subsequent amended complaint in the Delaware proceeding added a claim seeking damages for breach of the forum selection clause.[251] The defendant argued that the claim was defective as a matter of law because no Delaware precedent supported it. The *O'Steen* court denied the motion to dismiss, reasoning that "the Supreme Court of Delaware implied [in *El Paso*] that damages may be obtained for a breach of a forum selection clause, and an award of such damages does not contravene the American Rule."[252] *Id.* at \*4 (citing *El Paso Nat. Gas Co. v. TransAmerican Nat. Gas Corp.*, 669 A.2d 36, 40 (Del. 1995), *overruled in part by Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373 (Del. 2013)).

---

[249] *Cornerstone Brands Inc. v. O'Steen*, C.A. No. 1501-CC (Del. Ch.), Dkt. 79 ¶¶ 33–34; *id.* at Dkt. 84 ¶¶ 33–34.

[250] *Id.* at Dkt. 79 ¶¶ 33–34; *id.* at Dkt. 84 ¶¶ 33–34.

[251] *Id.* at Dkt. 59 Ex. B; *id.* at Dkt. 79.

[252] The court subsequently directed the parties to brief the issue, expressly reserving judgment as to the amount of any award until final resolution of the case. *Cornerstone Brands, Inc. v. O'Steen*, 2007 WL 2801384, at \*1 (Del. Ch. May 18, 2007). The parties settled the case before the court could resolve the issue. *Cornerstone Brands, Inc. v. O'Steen*, C.A. No. 1501-CC (Del. Ch.), Dkts. 157–58.

In *El Paso*, the Court upheld this court's dismissal of a cause of action seeking to enforce a forum selection clause requiring litigation of claims sounding only in law in this court for lack of subject matter jurisdiction. 669 A.2d 36. The appellant argued that it was entitled to specific performance of its negotiated forum selection provision and that the forum selection was a material term in the contract. The *El Paso* Court observed that "[t]hese arguments simply miss the point; neither the Court of Chancery nor the parties to a dispute can confer equitable jurisdiction where it is otherwise lacking," and reaffirmed that "jurisdiction of a court over the subject matter cannot be conferred by consent or agreement." *Id.* at 39 (internal quotation marks omitted). This portion of *El Paso* remains good law.

After finding that this court lacked subject matter jurisdiction, the *El Paso* Court also concluded that this court "correctly determined, *inter alia*, that El Paso could raise the forum selection clause in the Settlement Agreement as a defense in the first filed Texas action and, if successful, recover the costs of that litigation." *Id.* at 40. The *El Paso* Court reasoned that "the ability to raise the forum selection claim as a defense in the Texas action was an adequate remedy at law" and that, because "there is a defense cognizable at law the possessor of it has an adequate remedy at law and equity will not enjoin his adversary from suing." *Id.* (internal quotation marks omitted). It was this precise scenario that was presented to the *O'Steen* court: Cornerstone raised the forum selection clause as a defense in the Ohio action and

99

subsequently sought to recover the costs of that litigation.  But this remedy, available under our law at the time, has since been rejected by the Delaware Supreme Court.

Several years after *O'Steen*, the Court held that "[f]orum selection clauses are presumptively valid and should be specifically enforced unless the resisting party clearly shows that enforcement would be unreasonable and unjust, or that the clause is invalid for such reasons as fraud and overreaching."  *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) (cleaned up) (internal quotation marks omitted). Litigants subsequently identified a tension between *Ingres* and *El Paso*'s second holding.  Reconciling *Ingres* and *El Paso*, this court reasoned that the Court's ruling in *El Paso* rested on a finding that the forum selection clause at issue was improper from the outset.  *Carlyle Inv. Mgmt. L.L.C. v. Nat'l Indus. Gp. (Hldg.)*, 2012 WL 4847089, at *12 n.103 (Del. Ch. Oct. 11, 2012) ("In other words, the Supreme Court found that the forum selection clause at issue in *El Paso* was itself an improper one because it ignored the limited jurisdiction given this court by our state's laws."), *aff'd*, 67 A.3d 373 (Del. 2013).  On appeal, the Court affirmed this court's ruling in *Carlyle* in full and expressly overruled *El Paso* to the extent that it was inconsistent with *Ingres*, *Carlyle*, and *National Industries*.  *Nat'l Indus.*, 67 A.3d at 385, 388 ("To the extent that our decision in *El Paso* is inconsistent with our holding in this case or *Ingres*, *El Paso* is overruled.").

Solar finds no support from *O'Steen* for its contention that it is entitled to an award of damages based on the fees it incurred in enforcing the forum selection clause. First, *O'Steen* addressed a different factual scenario and the damages sought provided an alternative remedy. In *O'Steen*, Cornerstone did not seek a preliminary injunction from this court. Instead, guided by *El Paso*, Cornerstone used the forum selection clause as a defense in the Ohio action and later sought damages as an alternative remedy to injunctive relief in this court. Here, Solar sought and obtained a preliminary anti-suit injunction in this court and, therefore, has already been granted relief. *See Scott v. City of Harrington*, 1986 WL 4494, at *1 (Del. Ch. Apr. 14, 1986) ("Under the doctrine of election of remedies, a party who has two or more inconsistent remedies available, and elects to pursue one of them to the exclusion of the others, may not later pursue other inconsistent remedies."). Second, and more importantly, that portion of *El Paso* on which *O'Steen* relied has since been overruled. The Delaware Supreme Court has made clear that "[f]orum selection clauses are presumptively valid and *should be specifically enforced* [unless they are unjust or invalid]." *Ingres*, 8 A.3d at 1146 (cleaned up) (emphasis added) (internal quotation marks omitted); *see also Carlyle*, 2012 WL 4847089, at *12 ("[A]ny remedy other than specific performance would deprive Plaintiffs of the benefit of their bargain." (internal quotation marks omitted)). Solar pursued and received the remedy Delaware courts provide with respect to an enforceable forum selection

provision: enforcement thereof. Having prevailed on its motion for a preliminary anti-suit injunction and received the relief available to it, Solar must identify an exception to the American Rule supporting its request for fees.

Solar does not proffer an exception to the American Rule that supports the fee award it seeks. To the extent that Solar relies on *O'Steen* as, itself, an exception to the American Rule, it misapprehends the *O'Steen* court's ruling. There, the contemplated damages did not contravene the American Rule because they were not fees for the prevailing party—they were the remedy. Here, Solar has already received a remedy, and seeks its fees as the prevailing party. To the extent that Solar is advocating for a *per se* exception to the American Rule for enforcement of forum selection provisions, the court declines to create such a new exception. *See In re Del. Pub. Sch. Litig.*, 312 A.3d 703, 718 (Del. 2024) ("'Historically, our courts have been cautious about creating and expanding judge-made exceptions to the American Rule absent express and clear legislative guidance.'" (quoting *Dover Hist. Soc'y., Inc. v. City of Dover Plan. Comm'n*, 902 A.2d 1084, 1091 (Del. 2006) (finding that, despite having "clearly created a social benefit," "that benefit is not of the kind that justifies creating a new *judge*-made exception to the American Rule")). Rather, the authorities counsel the contrary. *See Hydrogen Master Rts., Ltd. v. Weston*, 228 F. Supp. 3d 320, 332 (D. Del. 2017) (observing that "the remedy for breach of a valid forum selection clause is specific performance" and that "[t]he court is aware of no

case where plaintiffs were allowed to recoup damages in addition to their remedy of specific performance" (citing *Carlyle*, 2012 WL 4847089, at *12)); *Barnard v. Marchex, Inc.*, 2024 WL 406441, at *8 (D. Del. Feb. 2, 2024) (dismissing a claim seeking damages for breach of a forum selection clause because "[u]nder Delaware law, the remedy for breach of a valid forum selection clause is specific performance" and observing that *O'Steen* is contradicted by more recent authority (alteration in original) (internal quotation marks omitted) (quoting *Carlyle*, 2012 WL 4847089, at *12)); *accord BuzzFeed, Inc. v. Anderson*, 2022 WL 15627216, at *21, *21 n.195 (Del. Ch. Oct. 28, 2022) (finding "no authority applying *El Paso* and [*O'Steen*]" to grant fees with respect to enjoining arbitration but finding "myriad examples of this Court enjoining arbitration without awarding fees or costs"); *see also Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 246 (S.D.N.Y. 2011) (denying a claim seeking damages for the fees incurred in defending an action filed in breach of a forum selection clause and observing that "[i]mposing a cost on someone seeking to enforce his rights—whether those rights arise from contract, statute, or common law—may seem inequitable. But shifting fees in such situations would create an exception that would swallow the 'American Rule'" (internal quotation marks omitted)).

That is not to say there is no circumstance in which the court would award attorneys' fees in connection with enforcement of a forum selection clause. For

example, "this court has discretion to shift attorneys' fees and costs when a party to the litigation has acted in bad faith." *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 880–82 (Del. Ch. 2012) (shifting one-half of fees where a party "made this case unduly expensive for the Minority Members to pursue" by "simply splatter[ing] the record with a series of legally and factually implausible assertions"), *judgment entered sub nom. Auriga Cap. Corp. v. Gatz Props., LLC* (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012). But "[t]he bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process." *Montgomery Cellular*, 880 A.2d at 227; *see Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *29–30 (Del. Ch. Jan. 29, 2010) (awarding fees in connection with a preliminary injunction only upon a showing of contempt of the injunction after its entry, and even then, only for the fees and expenses incurred in prosecution of the motion for contempt). Were a party to violate a forum selection clause in a manner so egregious as to constitute bad faith, damages might be appropriate under the bad faith exception to the American Rule. But that is not the case here. Solar makes no attempt to argue that Lundberg's original filing of these claims in Utah was in bad faith, nor does the

record support such a conclusion.[253] In fact, Solar did not brief, and therefore waived, any recognized exception to the American Rule.[254] Therefore, having failed to establish an exception to the American Rule, Solar is not entitled to recover damages for the fees it incurred in obtaining the antisuit injunction.

### 2. Solar is not entitled to a permanent injunction enforcing the forum selection clause.

Solar argues that it is entitled to a permanent anti-suit injunction preventing Lundberg from litigating claims arising out of the 2014 Plan in a venue outside of Delaware. Lundberg counters that this ruling and any appeal thereof will resolve all possible claims arising from the 2014 Plan.

---

[253] Rather, it appears that Lundberg originally filed all his claims in Utah because of Utah forum selection clauses in other agreements, and subsequently offered to consolidate all of the cases in the forum of Solar's choosing in an attempt to more efficiently resolve the parties' disputes. Dkt. 44 at 50:18–20, 51:18–20 (Lundberg's Counsel) ("There's no reason for us to have these trifurcated proceedings all focused on the exact same legal and factual dispute. . . . Let's get this issue resolved in one place, whether it's in one court in Utah, one court in front of Your Honor, or one arbitration."). Solar rejected Lundberg's offer. *Id.* at 69:20–70:1 (Solar's Counsel) ("And I would say, Your Honor, this, 'Gee, we will offer to have everything resolved here,' Your Honor, that isn't the issue. My client is entitled to the benefit of the bargain they struck with Mr. Lundberg in all the contracts at issue. They're entitled to it."). The court enforced the forum selection clause, noting that, as a result, the parties would "be litigating and/or arbitrating in at least two, and potentially three or four, separate venues in Delaware and Utah." Dkt. 48 at 30:19–21. At trial, Lundberg's counsel represented that the parties are now in six forums. Tr. 161:18–162:6. Though, as the court observed in its ruling on the preliminary injunction, this is "inefficient and a waste of all parties' resources," "it is the consequence of what the parties agreed to do by contract." Dkt. 48 at 30:22, 31:2–4. They did not, however, contractually agree to shift fees in connection with enforcement of the forum selection clause.

[254] *Emerald I*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

105

To obtain a permanent injunction, "a party must show (i) actual success on the merits, (ii) the inadequacy of remedies at law, and (iii) a balancing of the equities that favors an injunction." *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1232–33 (Del. Ch. 2022). "'[F]or a complaint to properly state a claim cognizable in equity solely because of a request for an injunction, the facts alleged must, if assumed to be true, create a reasonable apprehension of a future wrong.'" *Id.* at 1233 (quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 606 (Del. Ch. 1987)). A court may issue a permanent injunction "'where there is reason to believe that a defendant will resume his wrongful course of conduct.'" *Id.* (quoting *Weiner v. Miller*, 1990 WL 54915, at *1 (Del. Ch. Apr. 27, 1990)).

Solar does not face a reasonable apprehension of a future wrong absent a permanent injunction enforcing the forum selection clause. *Cf. BE & K Eng'g Co., LLC v. RockTenn CP, LLC*, 2014 WL 186835, at *23–25 (Del. Ch. Jan. 15, 2014) (entering a permanent injunction enforcing a forum selection clause with respect to then-ongoing and future anticipated claims), *judgment entered sub nom. Be&k Eng'g Co., LLC v. Rocktenn Cp, LLC* (Del. Ch. 2014), *aff'd*, 103 A.3d 512 (Del. 2014). Solar has already achieved the relief sought by successfully obtaining an antisuit injunction that forced Lundberg to litigate all of his claims that were subject to the exclusive forum provision in this court. As Lundberg acknowledges, all claims that could arise from the documents governed by that clause will be resolved upon the

106

closure of this case. Accordingly, there is no reason to believe that Lundberg will resume filing claims in contravention of the exclusive forum provision. Solar is not entitled to a permanent injunction.

## III. CONCLUSION

Solar is entitled to judgment on Count II as to the claims concerning the four tranches of RSUs that accrued before September 29, 2017, which are time-barred. Solar is not entitled to judgment as to the remainder of Count II, and Solar's claims for fees as damages and for a permanent injunction under its first count are denied.

Lundberg is entitled to a judgment in his favor for Solar's breach of the Awards with respect to the nine RSU tranches that are not time-barred and the 2015 Option Agreement, and the court awards damages equal to a base amount of $295,921.08, plus prejudgment interest, as compensation for Solar's breaches of the RSU Agreements, and a symbolic award of $12 in nominal damages for Solar's breaches of the 2015 Option Agreement. Lundberg is entitled to post-judgment interest on the sum of those amounts, which, together, constitute his judgment. Lundberg's counterclaims for breach of the implied covenant of good faith and fair dealing are moot. The parties shall confer and submit a final implementing order.

If there are any other issues that the court needs to resolve before a final order can be entered, then the parties shall submit a joint letter identifying them and providing a schedule for their resolution.